## WHITE SATIN MILLS CORPORATION v. WOODWARD et al.

District Court, D. Minnesota, Fourth Division. August 5, 1929.

See,. also, 25 F.(2d) 313.

F. A. Whiteley and Chester W. Johnson, both of Minneapolis, Minn., for plaintiff.

Trafford N. Jayne, of Minneapolis, Minn., and Stryker & Stryker, of St. Paul, Minn., for defendants.

JOHN B. SANBORN, District Judge. The plaintiff in its bill claims to be the owner of certain trade-marks for flour and sugar, alleges that the defendants have appropriated these trade-marks for their own use, and asks for an injunction, for an accounting, and for other relief. The plaintiff bases its claim to the trade-marks in question upon a purchase from the trustee in bankruptcy of White Satin Mills, Incorporated. The defendant John H. Woodward contends that White Satin Mills, Incorporated, never owned the trade-marks, that they belong to him individually, that he licensed their use, and that, upon bankruptcy, they reverted to him.

It appears that the trade-mark "White Satin," for sugar, was used first by John H. Woodward and Ralph P. Woodward, his brother, a copartnership doing a sugar business as J. H. Woodward Company. This trade-mark, as No. 166,348, was registered by J. H. Woodward Company. In August, 1922, the White Satin Sugar Company was organized by John H. Woodward. He, his wife, and his brother Ralph were the stockholders, officers, and directors. He was president. The name was afterwards changed to White Satin Mills, Incorporated. The Woodwards claim that Ralph Woodward withdrew from the partnership in May, 1922, and that John H. Woodward did business alone from that time until the corporation was formed. However, while Ralph Woodward testified to that, John H. Woodward, as I understood him, stated that he commenced the sugar business in 1919; that he was alone for one month, then his brother came with him, and the firm was J. H. Woodward Company; that his brother was with him six months, and then went out for five or six months, and then came back and stayed until the end.

John H. Woodward says that the corporation which he organized—while it took over the business and assets of John H. Woodward or the copartnership—never owned the trade-mark "White Satin" for sugar, but that John H. Woodward gave it a verbal license to use that mark. The corporation did exclusively use the trade-mark for its sugar, and continued to use it until it was adjudged bankrupt in the spring of 1927. It is certain that at that time John H. Woodward was claiming to own the trade-mark "White Sat-in" for sugar, and had been claiming to own it, at least since his corporation became financially involved. In September, 1924, the White Satin Sugar Company bought a number of trade-marks from the receiver of the Barber Milling Company, including two "White Satin" marks for flour. The company executed an assignment in October, 1924, of these two marks to John H. Woodward, or at least he has presented what purports to be such an assignment. His testimony is that he does not remember who paid for these trade-marks. He does not claim that he paid anything for them. Some two years after the assignment, one of these marks was registered in the name of the bankrupt corporation.

To corroborate his claims, John H. Woodward has produced his brother and a number of friends, who bought stock in a Delaware corporation organized by Woodward in 1926 for the purpose of holding the stock of White Satin Mills, Incorporated. The substance of the testimony of the friends is that, at the time they bought stock, Woodward told them that he owned the trade-marks individually, and that they did not belong to White Satin Mills, Incorporated. These men are credible witnesses, but obviously bought the stock in reliance upon Woodward's ability and largely as a favor to him. It is probably not very important whether he claimed the trade-marks at that time or not. However, Mr. Van Tuyl, who was one of the brokers in whose hands was placed the selling of the stock of this holding company, testified in effect that his firm prepared a prospectus from information furnished by John H. Woodward; that a considerable amount of stock was sold by them, and this prospectus was used in connection with its sale, and he says that no claim was ever made to him by Woodward that the White Satin Mills, Incorporated, did not own, or that Woodward did own, the principal trade-marks it was using. While the prospectus itself does not actually assert that the corporation owns these marks, that would seem to be a natural and permissible inference to be drawn from the reference which is made to them in the prospectus.

As to the trade-mark "White Satin" for sugar, the only definite knowledge we have of it is that it was registered in the name of the copartnership. There is no evidence of its ever being transferred to John H. Woodward as an individual, except his own statement and that of his brother. The time when the brother was out of the business is rather vague and uncertain. He was not out long, and was back at the time the corporation was formed.

160

Why should John H. Woodward have withheld the trade-marks "White Satin" from his own corporation and have merely given it a license to use them? The corporation was nothing more than his vehicle for conducting his business, just as the partnership had been before. He dominated both. The first registration indicates that he was not afraid of his brother, and was not trying to hold out the trade-marks because of him. His only explanation is that he expected to grant and did grant to others the right to use the words "White Satin." But if that was a part of his business, why could that not have been done just as well through himself as a corporation as through himself as an individual? It is obvious that the trade-marks of the Barber Milling Company were bought for the White Satin Mills, Incorporated, and paid for from the treasury of that corporation.

■ Did the White Satin Mills, Incorporated, own these trade-marks, or was it a mere licensee of them, at the time of bankruptcy? In dealing with questions of fact, such as this, one is not required to believe what to his mind seems unreasonable or improbable, even though uncontradicted. It is true that occasionally failure to believe the improbable results in injustice, because people sometimes do unreasonable and improbable things, but ordinarily they do not. To my mind it is not reasonable or probable that John H. Woodward, as an individual, or a copartnership, or whatever he may have been at the time he formed his corporation, verbally licensed himself as a corporation to use the trade-mark "White Satin." It is much more probable that he turned over everything, because there was no occasion for making any reservations up to the point of the organization of the holding company, and possibly even up to the time that the White Satin Mills, Incorporated, became financially involved. My conclusion is that the White Satin Mills, Incorporated, owned the trade-marks when it became bankrupt, and that John H. Woodward did not own them, and had no right, title, or interest in them.

■ The question, then, is whether the plaintiff now owns the trade-marks. Mr. Luick, who purchased the trade-marks and good will and organized the plaintiff company, knew that Woodward claimed to own these marks.

In fact, a lawsuit was then pending, brought by the trustee in bankruptcy against Woodward, to determine who owned the marks. It was dismissed on motion of the trustee after the sale. Nothing was said as to whether with prejudice or without. Shortly thereafter a motion was made to amend the order of dismissal, to show that it was without prejudice. The court stated, in substance, that it was unnecessary to amend it, as it was not upon the merits. In any event, the plaintiff was not a party to that suit, nor did the dismissal of it give to Mr Woodward any title to these trade-marks as against the assignee of the trustee. The plaintiff might have used greater diligence in bringing this suit, but Mr. Luick may have been somewhat justified in assuming that Mr. Woodward conceded some title in the trustee, since he also bid at the sale. It is true that the plaintiff has done little business, but the defendants have been using the trade-marks and carrying on the business substantially as before bankruptcy. The plaintiff has done enough to prevent any inference of abandonment of the trade-marks, and its claim is not barred by laches. Mr. Woodward has not been misled, either to his injury or otherwise, by the conduct of the plaintiff, nor has his new corporation.

It is claimed that the sugar in connection with which the plaintiff has used the trade-mark is not the same as that with which the defendants now use it, or with which the White Satin Mills, Incorporated, used it. The evidence indicates that it was mainly used for a particular kind of icing sugar manufactured by the bankrupt and by the defendants. The plaintiff has not furnished that kind of sugar. There is no showing that such sugar cannot be procured or manufactured by the plaintiff. There seems to have been a sufficient attempt by the plaintiff to keep these trade-marks alive, to justify a finding that its title to them is better than that of any person who merely appropriates them.

I reach the conclusion that the plaintiff obtained title to the trade-marks from the trustee, and should be permitted to have and use them and the good will of the White Satin Mills, Incorporated, without interference from the defendants.

A decree may be submitted upon reasonable notice.