[Civ. No. 24579.   Second Dist., Div. One.   Sept. 13, 1960.]

MAURICE H. LEVENTHAL, Appellant, v. OLLIE MORRIS EQUIPMENT CORPORATION (a Corporation) et al., Respondents.

554

Mason & Graham, Collins Mason, William R. Graham and John P. McGinley for Appellant.

Forrest E. Macomber and Gordon J. Aulik for Respondents.

FOURT, J.—This is an appeal from a part of a judgment which in effect determined that the plaintiff take nothing in his action involving a trademark or tradename.

Plaintiff brought this action against Ollie Morris Equipment Corporation, hereinafter referred to as Morris Corporation, and Offenhauser Equipment Corporation, hereinafter referred to as Offenhauser Corporation, to establish his claim as the owner of the trademark "Traction Master" alleging, among other things, that defendants had appropriated the trademark for their own use and further claiming that defendants had used the trademark "New Traction Master" which is so closely allied to the old trademark as to make for confusion and loss in plaintiff's business. The plaintiff sought an injunction, an accounting, damages and other relief. The defendant, Morris Corporation, filed a cross-complaint wherein it alleged that it was the owner of the trademarks "Traction Master" and "New Traction Master" and that plaintiff and cross-defendant had appropriated the trademark "Traction Master" as his own and cross-complainant sought an injunction, an accounting, damages and other relief.

A résumé of some of the facts is as follows:

In 1953 there were applications pending for United States Letters Patent on an automobile stabilizing device. One was known as the "Tatum" patent and the other as the "Meier" patent. The device was being manufactured by Tayboe Manufacturing Company, hereinafter referred to as Tayboe, which was a partnership consisting of Charles Tatum and Andrew Botto. Tatum, on behalf of Tayboe, had applied for the patent

and on September 18, 1956, Letters Patent Number 2,763,332 was issued. The device was, from the beginning, in 1953 called "Traction Master." The name "Traction Master" has been inseparably connected with the device and the name denotes that the device possessed certain qualities or characteristics which qualities and characteristics are set forth in the patent applications on both patents.

Tatum, on behalf of Tayboe, applied for and was granted a copyright on the name "Traction Master" by both the State of California and the Patent Office of the United States.

Tayboe assigned and transferred the "Tatum" Patent Number 2,763,332, the trademark and tradename of "Traction Master" to Auto-Master Corporation, hereinafter referred to as Master Corporation. Tatum and Botto went to work for Master Corporation. Master Corporation continued the manufacturing and sale of the device under the trademark "Traction Master" from about May 28, 1954 to June or July, 1955. Master Corporation was adjudicated a bankrupt on July 12, 1955. The trustee in bankruptcy of Master Corporation filed a supplemental inventory and appraisement in the bankruptcy proceedings in which was listed the "Tatum" patent, the good will and the trademark and tradename "Traction Master" as assets of the bankrupt estate. Torque-O-Matic Devices, Inc., hereinafter referred to as Torque bought the good will, patent and trademark and tradename "Traction Master" from the bankrupt estate. The sale was confirmed by the federal court on or about June 28, 1957. Torque also owned the "Meier" Patent Number 2,699,935.

A few days thereafter Torque granted an exclusive license the use of the "Tatum" patent and the "Meier" Patent Number 2,699,935 and the use of the trademark and tradename "Traction Master" to Morris Corporation. After some experimental work, consisting of additional engineering work to the end that the device would be perfected, Morris Corporation manufactured the device and marketed it under the name "New Traction Master," the first sale taking place about November 6, 1957, and has since continued to manufacture the device up to the time of trial.

Leventhal was employed by Master Corporation in May, 1954, on a commission plus expense account basis to sell the device that was called "Traction Master," and which at that time was manufactured by Master Corporation. Leventhal continued to sell the device until November 30, 1954, as an employee and thereafter sold the device, under an agreement, as

a local distributor for Master Corporation and continued the latter course up to about the time of the bankruptcy of Master Corporation.

When Master Corporation went bankrupt, Leventhal continued to market the device "Traction Master" on his own account, in the same location and without interruption. He purchased the component parts from the manufacturer who had manufactured the parts for Master Corporation and used Master Corporation's literature and advertising matter and the "Meier" patent number affixed to such devices, thereby leading the public to believe that he had a right to manufacture the device under the "Meier" patent and to use the tradename "Traction Master."

Master Corporation had expended about $140,000 in advertising and promoting the device called "Traction Master."

The trial court found in effect upon abundant and substantial evidence that Leventhal had misappropriated to his own use a valuable asset of the bankrupt estate and had misused his position of trust as an employee and distributor of Master Corporation; that Leventhal had wrongfully converted the tradename "Traction Master" to his own use and benefit and that he had come into court with unclean hands. The court further found that there was no evidence that the use of the tradename "New Traction Master" by Morris Corporation had misled or deceived the public into believing that it was buying the device sold by Leventhal and that there was no evidence that the use of the tradename "Traction Master" by Leventhal deceived or misled the public into believing that it was buying the device sold by Morris Corporation.

Torque did not manufacture or sell any stabilizing devices nor did it use the tradename "Traction Master" on any product manufactured or sold by it. As heretofore stated, Torque did grant an exclusive license to Morris Corporation to use the "Tatum" and "Meier" patents and the use of the tradename.

Offenhauser Corporation never manufactured any stabilizing devices but sold such devices which were manufactured by Morris under the tradename "New Traction Master."

The judgment provided that Leventhal take nothing as against Morris Corporation and that Morris Corporation take nothing as against Leventhal under its cross-complaint and further that Leventhal take nothing as against Offenhauser Corporation.

A motion for a new trial was denied. Appellant states that

558

he appeals from that portion of the judgment which dismissed his complaint and from the order denying his motion for a new trial. The record discloses that plaintiff's complaint was not dismissed. An order denying a motion for a new trial has not been appealable since the 1915 amendment to Code of Civil Procedure, section 963.

Appellant contends in effect that (1) the rights of Master Corporation to the trademark ''Traction Master'' were abandoned or destroyed when Master Corporation went into bankruptcy or at the latest when the trustee in bankruptcy sold the physical assets of the bankrupt apart from the trademark or good will; (2) that there was no fiduciary relationship to Master Corporation in August, 1955, which estopped him from adopting and using the trademark as his own and (3) that respondents have committed trademark infringements and unfair competition against him.

Each of the contentions is a factual matter and there was sufficient and substantial evidence in the record from which the judge could find and determine as he did so find and determine. Appellant has stated that the findings of fact and conclusions of law are unsupported by the evidence, but he has failed entirely by reference to the record to make good any such an assertion. A reading of the record makes it clear that the evidence in support of the findings of fact and conclusions of law is substantial.

■ It is true that as a general rule ''The right to a trademark or a tradename does not exist as an abstract right disconnected from the business in which it is used, and cannot be sold, assigned, or seized except in connection with the business.'' (47 Cal.Jur.2d 730.) There are, however, exceptions to the rule. ■ In Callman on Unfair Competition and Trade-Marks, 2d edition, volume 3, page 1287, section 78.1(c), it is stated:

''Where a trade-mark indicates that the goods to which it refers are of a certain quality, e.g., are made under a patent, . . . the mark can not be validly transferred even if the entire business and all its physical assets are included in the transfer, unless the transferee also acquires the right to work under the patent, . . . On the other hand, if the transferee is licensed to use the patent or the secret formula, the transfer is valid, even though the business itself may not have been transferred. And the courts have so held even under the earlier concept of the law, thus recognizing an exception to the rule that the entire business must also be transferred.''

*Tuttle* v. *Blow*, 176 Mo. 158 [75 S.W. 617] is one of the authorities cited in the Callman work as authority for the statement therein contained. In the Tuttle case it was stated at page 620 as follows:

"It may be conceded to appellants that a mere trade-mark, dissociated from the trade or business, is not susceptible of sale or transfer. As such it is of no use, and the law will take no account of it. But a trade-mark as an accessory of property, or as a thing to be used in connection with one's business, and applicable to the product of his manufactory or to his goods in trade, is a subject of the law's care, and is assignable. . . . Whilst some of the authorities cited in their brief bear out the appellants' contention that a trade-mark, unconnected with any property or trade, is a mere abstract right of which the law will take no account, none of them sustain the proposition that a trade-mark, connected with the right to make and sell the thing which it indicates, is not susceptible of being transferred by a mortgage."

Appellant relies heavily upon *Ward-Chandler Building Co.* v. *Caldwell*, 8 Cal.App.2d 375 [47 P.2d 758], from which the statement in California Jurisprudence, *supra*, is taken. However, at page 377 of the Ward case it is stated:

". . . 'An exception to the general rule has, however, been made where the mark or name has been so employed as to be deprived of its personal nature and has come to indicate that the goods bearing it are of a certain standard, kind or quality or are made in a certain manner or after a certain formula.' (26 R.C.L. 865.) The same exception should apply where services of a certain standard, kind or quality are rendered, and the name under which such a business is conducted is properly transferable under section 993 of the Civil Code."

It is further stated in the Ward case at page 379:

". . . 'The reason for this is that if the bare right of user could be transferred the name or mark would no longer serve to point out and protect the business with which it has become identified, or to secure the public against deception, but would tend to give to a different business the benefit of the reputation established by the business to which the name had previously been applied.' (26 R.C.L. 864.)"

In this instance the trial court apparently determined from the evidence that the reasons for the exception were present and that the exception should be applied in this particular case and with which we agree.

560

In 30 Michigan Law Review 489 at 498 it is stated:

"If the mark in question denotes that the goods to which it is affixed possess a certain quality or characteristic, as is frequently the case, an assignment should be possible without the transfer of any physical plant or going business."

The federal courts have recognized the exceptions. In *White Satin Mills Corp.* v. *Woodward,* 34 F.2d 158 the first headnote reads:

"Trade-marks and trade-names and unfair competition. Corporation purchasing trade-marks from trustee of bankrupt corporation held entitled thereto against owner of bankrupt corporation, claiming individual ownership of trade-marks.

"In bill to enjoin defendant from appropriating trade-marks, evidence *held* to show that defendant, organizing and owning original corporation, did not own trade-marks individually, and was not licensor thereof to his corporation, but that corporation owned trade-marks when it became bankrupt, and that plaintiff corporation, purchasing trade-marks from trustee in bankruptcy, and not abandoning same, had better title to trade-marks than defendants appropriating them."

The fact that Master Corporation went into bankruptcy is some evidence of an intent to abandon the trade-name but it is not conclusive of abandonment. It is only one item of evidence in the entire record. There was other substantial evidence or inferences which could be drawn from such evidence which the court considered and all in all it was determined that there was no intent to abandon the tradename as contended by Leventhal.

The trustee in bankruptcy owed a duty to all concerned to preserve the assets of Master Corporation and in liquidation to secure as much for such assets as was possible. Here the trustee sold the tradename and the patent inseparably connected with each other and the good will of the bankrupt concern.

Appellant's next contention in effect is that in the light of Master Corporation allegedly abandoning the tradename by the bankruptcy proceeding he had a right to immediately adopt the tradename. As the trial court determined upon substantial evidence, there was no abandonment by Master Corporation. Leventhal could gain nothing upon any such an assumption.

Appellant has cited *Reconstruction Finance Corp.* v. *Menihan Corp.,* 28 F.Supp. 920 in support of his contention. In that case, during the depression years, Menihan Company,

561

which manufactured and sold shoes, made a loan from the plaintiff, a governmental agency, and secured the same by a renting of the property of the company. The company defaulted and was adjudicated a bankrupt. A public sale was held by the trustee in bankruptcy and the plaintiff bought practically all of the property of the bankrupt including the good will, trademarks and tradenames. Shortly thereafter the defendant corporation was organized. Defendant, J. G. Menihan, Sr., who had been president of the company which had made and defaulted in the loans from plaintiff was the president of the defendant corporation. The new corporation started to make shoes once more and used the trademarks and tradenames of the original company. The plaintiff sought to stop them from such conduct. The plaintiff, after having bid the property in at the trustees sale, not only abandoned the business but as the court said at page 923 of the reported case, "[T]he plaintiff's acts amounted to more than abandonment. They amounted to the destruction of what was necessary to the existence of a business to which good-will, trade-marks and trade-names might attach." Such was not the situation in the case before us.

Furthermore, this is an equity case and the trial judge in this situation on substantial evidence found that Leventhal had come into court with unclean hands and he was not entitled to prevail.

Appellant further asserts that the public was deceived and is likely to be further deceived by the respondents' use of the trademark "New Traction Master." The court made a finding to the contrary. The judge had the advantage of seeing and hearing the witnesses testify. He has the power of acceptance or rejection of the testimony generally and a reading of the record in this case demonstrates that he was entirely proper in making the determination which he did make.

Lastly, the appellant would have this Court set aside the findings of fact and conclusions of law of the trial court and make new findings to conform with his wishes in the matter. From what has heretofore been stated, it is apparent that we are not inclined to change the findings or the judgment.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 9, 1960.