HURRICANE FENCE COMPANY et al., Plaintiffs,

v.

A–1 HURRICANE FENCE COMPANY, INC., et al., Defendants, Counter-Claimants, and Third-Party Plaintiffs,

v.

SARALAND FENCE COMPANY, Third-Party Defendant, Counter-Claimant, and Cross-Claimant.

Civ. A. No. 77–573–H.

United States District Court, S. D. Alabama, S. D.

March 11, 1979.

Michael A. Andrews, Houston, Tex., and Michael D. Knight, Mobile, Ala., for plaintiffs.

William H. McDermott, Mobile, Ala., and James D. Halsey, Jr., Washington, D. C., for A–1 Hurricane Fence Co.

Sidney H. Schell, Mobile, Ala., for Pete Hutchins.

HAND, District Judge.

This is trademark infringement action that questions the aggressiveness with which a trademark owner is to be expected to protect its mark. The plaintiffs contend that the defendants have infringed upon the trademark "Hurricane" and the "blowing man" logo through continued usage of the trademark and logo without permission from the trademark owners, and the plaintiffs seek injunctive relief restraining the defendants from further utilization of the trademark in their businesses and treble damages for all damages suffered by the plaintiffs as a result of the alleged infringements. Defendant A–1 Hurricane Fence Company (of Mobile), in answer to the complaint, alleges that the plaintiffs have abandoned their trademark rights to the name "Hurricane" and the "blowing man" logo, that the plaintiffs are estopped by laches from bringing this suit at this time due to

their failure to object to the defendant's usage of the mark over the last eight years, and that the plaintiffs have apparently or impliedly acquiesced in the defendant's usage of the mark. Contemporaneous to the answer this defendant filed a "counter-claim and third-party complaint," in which this defendant requests that the Court enjoin both the plaintiffs and the third-party defendant from using the trade names "Hurricane Fence Company," "Hurricane Fence," or "Hurricane," and from otherwise infringing upon the defendant's established trade name in the trade area encompassed by its Mobile operation, and that damages be awarded in the defendant's favor for losses of business, customer goodwill, and profits sustained as a result of the allegedly wrongful activities of the plaintiffs.

The plaintiffs did not respond to the counter-claim, so, under the Federal Rules of Civil Procedure, all averments therein are deemed denied. The third-party defendant, Saraland Fence Company, [Saraland] admits that it has advertised under the trade name of Hurricane Fence Company but it denies all other allegations set out in the third-party complaint. Additionally, Saraland has counter-claimed against the defendant and third-party plaintiff A–1 of Mobile for interfering with Saraland's business relationship with its clients and Saraland seeks recovery of damages therefor. Also, Saraland has filed a counter-claim against the plaintiffs for breach of the agreement by which Saraland understood it had received exclusive rights to the trade name "Hurricane" in the Mobile area. This counter-claim is more aptly a cross-claim with respect to the third-party complaint. Defendant A–1 of Mobile denies that it in any way interfered with Saraland's business relationships, and the plaintiffs filed no response to the cross-claim, so the averments therein must be deemed denied.

This matter came on for trial before the Court on January 15, 1979 and, after four days of presentation of evidence, the matter was submitted for determination by the Court on the evidence and the post-trial briefs of counsel. The Court has considered the record, the evidence adduced at trial, and the arguments and memoranda of law propounded by counsel for all parties, together with the applicable law, and the Court finds as follows:

## FINDINGS OF FACT

1. The plaintiff Hurricane Fence Company [HFC] is a partnership consisting of Raymond G. Schindler and Leon A. Schindler with its principal place of business being in Houston, Texas. Plaintiff Hurricane Steel Industries Company [HSI] is a Texas corporation with its principal place of business in Houston.

2. Defendant A–1 Hurricane Fence Company, is an Alabama corporation and it has its principal place of business in Mobile, Alabama. Defendant A–1 Hurricane Fence Company of Huntsville, Inc. is also an Alabama corporation with its principal place of business in Huntsville, Alabama.

3. Third-party defendant Pete Hutchins is a resident citizen of the State of Alabama. His answer denies that he is doing business as the Saraland Fence Company, but rather avers that he is the principal stockholder in Saraland Fence Company, Inc., an Alabama corporation whose principal place of business is Saraland, Alabama. Although there has been no specific pleading in this case requiring substitution, it appears to the Court by the conduct of the parties that Saraland Fence Company, Inc. has been substituted in effect as third-party defendant in the place of Pete Hutchins.

4. HFC was the brainchild of Raymond Schindler, who started the company shortly after World War II. At the time he initiated the business, the company was engaged only in the erection of fence and was in no way engaged in the manufacture of fencing or accessories. Schindler adopted the name "Hurricane" to describe his fences, and shortly thereafter employed an artist to conceive a logo to go with his newly adopted trade name. The artist used Schindler's father as a model and conceived a "blowing man" logo reminiscent of Thor in Scandinavian mythology. Schindler adopted both the name and the logo as symbolizing his

fencing, and the logo and name were registered with the United States Patent Office on September 17, 1957 by HFC for a term of 20 years. The registration of the Hurricane name was renewed on July 27, 1976 for another 20 year period, but the renewed registration did not extend to the logo. [Plaintiffs' Exhibit 8]. The name and logo were first registered with the Alabama Secretary of State on October 28, 1957, and this registration was renewed on April 26, 1977. [Plaintiffs' Exhibits 7 & 7A].

5. The mark was registered on all occasions by plaintiff HFC, which in the late 1940's and the 1950's was engaged primarily in the sale of chain link fence. In 1961 plaintiff HSI was incorporated in the State of Texas by the partners of HFC and others. The purpose of establishing this company was to provide a manufacturer for HFC's products. HFC licensed its mark to HSI for its use in the manufacture of chain link fencing and other component parts used in the fencing business. Since it has been in business, HSI has sold chain link fence and component parts to independently owned companies, and has sublicensed the mark and logo to many of these companies, who sell and erect fences for residential and commercial customers. The only relation that HFC has to this series of transactions is that it is the registered owner of the mark and is engaged in the retail fence business itself through a Houston outlet.

6. Companies who sell and erect fencing and other materials manufactured by HSI fall generally into two categories: those licensed dealers who have by written agreement been afforded the right to use the name Hurricane and the blowing man logo; and other dealers who do not use the mark (or at least have no right by contract to use the mark). At the time of trial there were twenty-four licensed Hurricane dealers in various areas of the country, the only licensee in the Mobile area being the Saraland Fence Company, third-party defendant in this action.

7. The evidence does not clearly establish the extent to which HSI marked its manufactured materials with its mark or logo prior to delivery to various outlets. Some, but not all, of the component parts manufactured by HSI feature the name Hurricane or other identifying marks. [Plaintiffs' Exhibit 18A–F; Defendants' Exhibits 7 & 8]. The chain link fence in itself is not marked, although identifying plates may be purchased by the dealers and in many cases are attached to the fencing by the dealers. [Plaintiffs' Exhibits 1 & 2; Defendants' Exhibit 33]. None of the plates reflect that "Hurricane" is a registered trademark.

8. Neither HFC or HSI has advertised the name and mark Hurricane and the blowing man logo in the State of Alabama or in any of the trading areas in which the defendants participate. In all areas in which it conducts business HSI relies upon the advertising of its licensed dealers, and it does not reimburse the dealers for advertising expenditures. Most of the dealer advertising is conducted in local newspapers and telephone book yellow pages [e. g., Plaintiffs' Exhibits 10, 12, 13 & 21A–C], although HSI has on occasion provided dealers with materials to be employed for advertising purposes. HSI does advertise in the trade journal *Fence Industries*, which generally is distributed to fencing companies [Plaintiffs' Exhibit 17A–D], but these advertisements would appear to be directed toward retailers, not consumers.

9. The defendants, A–1 Hurricane Fence Company, Inc. and A–1 Hurricane Fence Company of Huntsville, Inc., are both Alabama corporations doing the bulk of their business in the State of Alabama. The Mobile operation was organized in January of 1969, while the Huntsville operation was not in business until December of 1976. The Mobile business has a branch in Pascagoula, Mississippi. All of these operations were initiated by and are presently overseen by John Rollins.

10. Rollins first became associated with HSI in the late 1960's through his brother, who was and is in the retail fencing business in Florida. Rollins met with HSI agents in Houston in February of 1967 and

eventually began operations in the Abilene, Texas, area as a retail dealer for HSI products. Rollins signed an agreement with HSI under which he was permitted to use the mark and name Hurricane during the period from March 6, 1967 to October 31, 1967. [Plaintiffs' Exhibit 14]. Rollins' efforts in Abilene were largely unsuccessful and he moved to Mobile, Alabama in July of 1967.

11. After arriving in Mobile, Rollins purchased his brother's fencing company (AAA Hurricane Fence Company) that had previously operated in Mobile. The purchase left Rollins with fencing materials previously purchased by his brother from HSI, together with the HSI materials that he had brought with him from Abilene. It is not clear whether Rollins acted under the terms of the prior agreement in his Mobile operation during the period from July to November of 1967, but on November 16, 1967 an identical agreement was entered into to cover the period through October 31, 1968. [Plaintiffs' Exhibit 5]. Rollins was authorized to use the trade name Hurricane for advertising purposes in Mobile, Baldwin, and Washington Counties in Alabama. This agreement was renewed in 1968 by the signing of a separate agreement on October 31, 1968 to carry the contract through October 31, 1969. [Plaintiffs' Exhibit 6]. This was the last time that a written contractual relationship existed between these parties.

On February 1, 1969 John A. Ignas, General Sales Manager for "Hurricane Industries," wrote to Rollins and informed him that the contract accompanying the letter superseded any prior agreements between the parties and was set up "strictly for bona-fide Hurricane Fence Dealers only." [Defendants' Exhibit 12]. The contract was to be valid upon its being signed and returned to the HSI office in Houston. Rollins testified that the letter confused him to some extent, but the Court is satisfied that he was properly aware of the significance of the letter. Rollins considered the contract and feared that the new agreement might require him to relinquish rights that he had acquired in the name and mark "Hurricane" and that the agreement would

allow HSI to place competing dealers in his market area. As a result of this, Rollins told his wife to return the contract to HSI unsigned, and her testimony revealed that she did. On August 27, 1969 Ignas again wrote Rollins and noted that HSI had not received the signed contract. [Defendants' Exhibit 34]. Mrs. Rollins noted on the letter that she had returned the unsigned contract on May 5, 1969. At no time since October 31, 1969 has there been a written contractual relationship between Rollins and HSI.

The printed dealer's contract that Rollins rejected was admitted into evidence as Defendants' Exhibit 23. Under the terms of the contract HSI reserved the right to set up more than one dealer in the dealer's area and required the dealers to relinquish any and all rights they might have acquired in the trade name or the mark upon the termination of the dealer's relationship with HSI. It is easily seen that Rollins' fears were not unfounded.

12. There are six different factual areas that purportedly support the various defenses set forth by the defendants:

A. The differences between the operating provisions of the 1968 and 1969 written agreements between HSI and Rollins and the relationship between the defendants and HSI from 1969 to the present;

B. The absence of "controls" by the plaintiffs over the operations of the defendants in Alabama and Mississippi;

C. The absence of such "controls" by HFC over HSI's use of the trade name and mark "Hurricane" and the "blowing man" logo, and the absence of controls by either of the plaintiffs over the use of the mark and name by licensed dealers and the defendants;

D. The plaintiffs' knowledge of the defendants' activities during the period from 1969 to 1977;

E. The conflicting usage of the marks and names by the parties;

F. The conflicting slogans of the plaintiffs and the defendants.

A. *Operating provisions of 1968 and 1969 written agreements in contrast to the relationship between the defendants and HSI from 1969 to the present.*

13. A–1 Hurricane Fence Company, Inc., was incorporated on January 28, 1969 pursuant to Articles of Incorporation filed in the Mobile County Probate Court. [Defendants' Exhibit 17]. The Pascagoula, Mississippi branch office was opened in 1968, although authority for the opening of the branch was not obtained from the Mississippi Secretary of State until July 11, 1973. [Defendants' Exhibit 19]. A–1 Hurricane Fence Company of Huntsville, Inc., was incorporated in December of 1976 pursuant to Articles of Incorporation filed in the Mobile County Probate Court. [Defendants' Exhibit 18].

14. During the period from 1969 to 1977 these defendants practiced exclusive use of the name and mark "Hurricane" in connection with the advertising, retail sale, and erection of fences of varying types and styles in the commercial area of Mobile, Baldwin, Washington, Madison, Marshall, and Morgan Counties in Alabama, and Jackson and Harrison Counties in Mississippi. The defendants have used fencing and component parts purchased from HSI on some occasions, but they have also made substantial use of products manufactured by companies other than HSI. The defendants have made widespread use of the "Hurricane" name and mark in advertising, including the use of display plates on erected fences, yellow page advertisements in telephone directories, newspapers and bulletins, business cards, statements, letterheads, and in various other ways. [Defendants' Exhibits 11, 20 & 21].

15. Between the time that A–1 was incorporated in 1969 and the 1977 establishment of Saraland Fence Company neither HSI nor HFC made any use of its trade name or mark in the defendants' trading area. However, this failure may in part be attributed to HSI's apparently erroneous conclusion that Rollins was still their dealer in these areas, since he continued use of the trade name and mark and since he continued to make purchases of materials from HSI. Rollins' sales climbed rapidly from $283,625.00 in 1969 to $929,573.00 in 1972. The sales have leveled off near the $1,000,000.00 mark every year since then, and Rollins testified that he spent approximately $100,000.00 during the period from 1969 to 1977 in advertising the Hurricane name.

16. Although there is no question but that no written contract has existed between HSI and Rollins since 1969, the evidence reveals that HSI was not very diligent in enforcing what it assumed to be its contract rights with respect to Rollins. The first paragraph of the licensing agreements of 1968 and 1969 [Plaintiffs' Exhibits 5 & 6] limits the dealer's use of the trade name and mark to products sold to it by HFC and extended the license only to activities conducted in Mobile, Washington, and Baldwin Counties in Alabama. However, the evidence clearly reveals that Rollins used the trade name and mark in connection with the sale of all of his products and did not limit his operations to the three county area. This has been true since the 1969 incorporation. Indeed, Defendants' Exhibit 32 clearly indicates that Rollins has never acted exclusively as a dealer for HSI products, for the figures set out in the exhibit indicate that he never bought more than 51% of his chain link fence components from HSI and that in most years his purchases were substantially less than this. The Court does note from this exhibit, however, that Rollins relied on purchases from HSI to a larger extent until 1976. In 1976 he bought only 7% of his chain link fence components from HSI, and this figure dropped to 2% in 1977 and to 0 in 1978. In spite of these clear breaches of the licensing agreements, HSI never took any measures against Rollins until shortly prior to the institution of this suit.

Another breach of the agreements resulted from the fact that Rollins failed to notify HSI's agents when he began to deal in fence materials manufactured by companies other than HSI; the licensing agreement required such notification. At no time did HSI raise objections to this, but this could

possibly be due to lack of notice on HSI's part.

A final point relied upon by Rollins to support his position with respect to the differences in his relationship with HSI after the written agreements expired is the fact that during the first two years of Rollins' operation in Abilene and Mobile he was visited on various occasions by HSI representatives who sought to sell him chain link fence, but following his refusal to sign the proffered dealer agreement in 1969 these visits were discontinued until 1974.

17. There are, of course, some facts supporting the plaintiffs' contentions on this point. The evidence reveals that agents of the plaintiffs periodically contacted Rollins either personally or by telephone on numerous occasions, and that Rollins never intimated either directly or indirectly that he wished to terminate his status as a licensed dealer, or that he deemed the licensed dealer status to have expired with his failure to return the proffered contract in 1969. Beyond this, the evidence is clear that nothing in the conduct of Rollins in the early periods of the controversy, from 1969 to 1975, would give rise to a reasonable suspicion that he deemed himself to be other than a licensed dealer for the plaintiffs' products. He continued to erect fences using material purchased from the plaintiffs; he continued to advertise as a "Hurricane" dealer; and he continued to buy materials from the plaintiffs in substantial quantities. Indeed, the Court is of the opinion that it was not until Rollins began ordering substantially less material from the plaintiffs that the plaintiffs had any reason to believe that he was acting other than as a licensed dealer.

B. *Absence of "controls" by the plaintiffs over the defendants' operations in Alabama and Mississippi.*

18. During the period that Rollins was operating in Abilene and Mobile under the licensing agreements with HSI (1967–1969) he was provided no material assistance with respect to setting up and operating his retail fence business, but rather relied upon the experience he had obtained from his brother's Pensacola, Florida fence business. There was no training program to initiate the new dealer into the workings of the business, nor were there any written instructions or specifications with regard to the selection or installation of fencing material. None of the work performed by Rollins was supervised or reviewed by HSI or its agents. The plaintiffs did not specify the format or style of advertising employed by Rollins, nor was it reviewed by the plaintiffs. Rollins was never provided with any policies or standards of HSI or HFC regarding the manner in which the trade name, mark, and logo should be utilized, nor did they specify any type of identification to be placed on the fences. In short, the evidence is clear that in making Rollins a dealer of Hurricane products, the plaintiffs licensed to him the mark and expected him to employ the name to sell their fences without any great supervision by either HSI, HFC, or any of their agents.

19. Sam Griffith, an HSI employee, testified that he visited Rollins in Abilene for one or two days, although Rollins contends that the visit really lasted only about an hour. The visit was for the purpose of selling HSI fence materials to Rollins, however, and does not appear to have been a review or survey of the work of Rollins as a Hurricane dealer.

20. The evidence clearly established that no representative of either HSI or HFC had first hand knowledge of Rollins' ability as a retail fence dealer. The plaintiffs made no effort to ensure that he was qualified, nor did they take any steps to ensure that the fences installed by Rollins or his employees were properly installed, as might be expected of a mark owner who would be disinclined to have his mark appear on poorly done work.

21. Since 1969, when Rollins returned the proffered dealer's agreement to HSI unsigned, neither of the plaintiffs have exerted any control over the operation of the defendants' businesses in any respect. The only relationship between the plaintiffs and the defendants since that time has been that of manufacturer to retailer, with the

defendants, prior to 1978, purchasing some of their chain link fence materials from the plaintiffs. The construction of this continuing relationship is important, since there is a material dispute as to the animus of the parties involved. The plaintiffs contend that the continued purchases by Rollins amounted to a renewal by conduct of the pre-existing written contracts, while Rollins and the defendants aver that there was no such intent in the continued dealings. From the evidence adduced at trial, the Court is of the opinion that the plaintiffs' position has merit, since the defendants never changed their course of conduct after the alleged expiration of the contract.

22. HSI contests the control issue, alleging that it has been involved in the activities of its local dealers. There is in. evidence a publication by HSI entitled "Things that Hurricane will do or teach you how to do" [Defendants' Exhibit 13] that provided instruction in many areas of particular concern to retail dealers, such as selling, installation, bookkeeping, and other areas. The publication was not released until 1976, however, and there is no evidence that either HSI or HFC ever provided any of the defendants with any of the instructions or materials described in the publication. The plaintiffs also argue that since Rollins had been trained by his brother, who was also a licensed Hurricane dealer, they had no concern with the fences he erected, apparently assuming competence from their knowledge of the brother's ability. The evidence is clear that the plaintiffs never received any major complaints concerning Rollins' work, but, of course, it is not likely that customers of the defendants would have any reason to forward any such complaints to the plaintiffs.

23. Another agent of HSI, Howard Benz, testified that he had made calls for HSI on the dealers, including the defendants, for many years, but that the purpose of his visits had been only to sell HSI products, not to supervise or review the activities of any of the dealers. He had never assisted in the installation of any fences, since he felt he knew less about that than the dealers themselves, and he testified that he knew of no control that either HSI or HFC exercised over licensed dealers.

24. A former salesman for HSI, David Mintz, related at trial that during his employment with HSI's Houston office he on many occasions had to communicate over the telephone with both licensed and unlicensed dealers. He was not aware during his employment of any training programs offered to new or existing dealers with respect to any facet of the retail fence business, nor had he ever seen written instructions or specifications relative to the conduct of such a business. He also testified that at no time did he receive proposed advertising for review from dealers, nor did he ever see any instructions regarding the use of the trade name, mark, or logo by any dealer.

25. On the basis of the evidence presented to the Court, the Court finds that the relationship between the plaintiffs and their licensed dealers was such that HSI merely permitted the dealers to use the trade name, mark, and logo without significant supervision for so long as the dealers continued to purchase significant quantities of chain link fence materials from HSI.

C. *Absence of controls by HFC over HSI's use of the name, mark, and logo, and absence of controls by either of the plaintiffs over the use of the name, mark, and logo by licensed dealers and the defendants.*

26. As noted previously, HFC is the owner of record of the registered trade name and mark "Hurricane" and of the "blowing man" logo. [Plaintiffs' Exhibits 7 & 8]. In spite of this, HFC has allowed HSI to hold itself out as the owner of the name, mark, and logo. This has resulted from HFC licensing the name and mark to HSI, and from HSI's subsequent sublicensing of the mark to various dealers.

27. In the written licensing agreements signed by Rollins in 1967 and 1968 HFC is identified as the licensor of the marks and name. However, the agreements were signed by R. F. Decker and Travis Mc-

Donald, who were employees of HSI, not HFC. Thus, it is not entirely clear by whose authority, if any, the name and mark were licensed to the dealers under the early written agreements. The subsequent agreements, including that between HSI and third-party defendant Saraland Fence Company, identify HSI as the owner of the name and mark "Hurricane." Certain of HSI's letterheads [Plaintiffs' Exhibit 11; Defendants' Exhibits 13, 14 & 30] include an asterisk adjacent to the word "Hurricane" with the notation below:

"Reg. U.S. Patent Office

A trademark of Hurricane Steel Industries Co."

Thus, there can be no question but that while HFC is by law the owner of the name and mark, it has permitted HSI in dealer agreements and on its letterheads to hold itself out as the owner of the name and mark.

28. The plaintiffs have adopted a policy that does not permit licensed dealers to use the word "Hurricane" in their company names. In a letter dated November 24, 1975 from HSI's attorney to the attorney for a Daytona Beach, Florida, dealer [Defendants' Exhibit 29], HSI's attorney stated that:

Please be advised, that Hurricane Steel Industries is unwilling to permit your client to utilize the name "Hurricane" in any corporate organization. Although Hurricane Steel Industries will permit the use of its name in connection with advertisement for and the actual sale of its products . . . the possible liability that might be imposed on Hurricane Steel Industries is too great for them to permit your client to incorporate or utilize the trade name. Further, the use of the name Hurricane in a corporation's name would deny the control over the trademark that is necessary for Hurricane Steel Industries to avoid having its name become part of the public domain.

While it is not clear whether this advice was given to all licensed dealers, it is admitted by the plaintiffs that 16 of their 24 licensed dealers use the name Hurricane

Fence Company. [Defendants' Exhibit 36]. Additionally, on a more local level, despite the fact that HSI's agreement with the third-party defendant Saraland Fence Company prohibits the dealer from using the trade name "Hurricane" and requires that the dealer identify itself as the owner and sole proprietor [Plaintiffs' Exhibit 15], Saraland's 1977 yellow pages ad [Defendants' Exhibit 35] includes the words "Hurricane Fence Industries" and does not identify Saraland by name.

29. With respect to control of the mark by the owner in other areas, the evidence is clear that such control was not pursued diligently. It is clear from the terms of the dealer's agreement [Defendants' Exhibit 23] and the letter to the Daytona Beach attorney [Defendants' Exhibit 29] that HSI was aware that its lack of control over the mark could result in a loss of rights. Yet no licensing agreements were sent out to dealers by HSI between 1970 and 1975. HFC and HSI permitted, or failed to object to, the practice of their licensed dealers of using the name and mark in advertising, selling, and installing fences having no relationship to the plaintiffs' enterprises. Testimony revealed that the defendants herein are not the only ones who have made use of the name and mark in connection with the sale and installation of wooden fences which HSI does not even make. Defendants' Exhibit 33 reveals that plates have been attached on some occasions identifying some wooden fences as Hurricane fences.

D. *Plaintiffs' knowledge of the defendants' activities during the period 1969 to 1977.*

30. It is undisputed that the plaintiffs were aware of the defendants' use of the word "Hurricane" in their company name and of their use of the trademark "Hurricane" in the conduct of their businesses, both during the time that Rollins was a licensed dealer for HSI from 1967 to 1969 and during the subsequent period when there was no written agreement between the parties. However, as mentioned above, there is absolutely no evidence that either

HFC or HSI actually knew that Rollins had expropriated the use of the name and mark for his own benefit and to their detriment.

31. Raymond Schindler, President of HSI and a partner in HFC, testified that although there was no written agreement between the parties after 1969, the plaintiffs believed that a licensing agreement was in full force and effect between the parties because the defendants were purchasing chain link fence from HSI, and because the defendants had never expressly asserted a claim of ownership to the mark and name "Hurricane." This conclusion on the part of the plaintiffs was aided by the fact that HSI's agent in charge of maintaining the dealer licensing agreements died during this period.

32. The plaintiffs had knowledge, as noted above, that the defendants were using the name and mark "Hurricane," but they took no action to stop such usage until April 18, 1977, when Paris Schindler, writing on behalf of HSI, wrote to Rollins and informed him that the defendants were thereby given their 30 days notice that they were no longer considered Hurricane dealers and that they no longer had the right to use the name and the mark. [Plaintiffs' Exhibit 11]. This is the first indication that HSI intended to exert control over usage of the mark by the defendants.

E. *Conflicting usage of the marks and names by the parties.*

33. The defendants in this case have not used the blowing man logo in connection with their businesses since 1975. They have, however, extensively utilized the trade name Hurricane in connection with almost all aspects of the businesses. The evidence did not reveal, on the other hand, that the defendants' usage of the trade name or logo had resulted in any actual confusion between the plaintiffs and the defendants in the trade areas in which the defendants operated, nor was there any evidence to establish that consumers in these areas were led to believe that there was any relationship between the plaintiffs and the defendants, or that the defendants were

dealers for the plaintiffs. In addition, there was no evidence to indicate that purchasers of fencing from the defendants were induced to such purchases on the belief that the source of the materials was either of the plaintiffs. On the other hand, the Court finds that the trade name Hurricane has by itself brought many sales to the defendants, the evidence revealing that the description "Hurricane fence" is of common usage in the public vernacular, and has acquired secondary meaning under the law.

34. From the evidence presented, the Court finds that no actual confusion existed between the plaintiffs and the defendants, or their products, in the trade areas of the defendants, resulting from the defendants' use of the mark and name "Hurricane" and the "blowing man" logo, at least from 1969 to 1977. This finding is buttressed by the fact that the plaintiffs did not compete in these trading areas with the defendants from 1969 to 1977, and did not advertise their products in any of these areas. However, in making this finding, the Court keeps well in mind that the name under which the defendants grew and prospered was supplied by the plaintiffs.

35. There is a more tangible likelihood of confusion in the fact that the third-party defendant Saraland Fence Company is now doing business in some of the defendants' trade areas as a licensed dealer for the plaintiffs' products. Since 1977, both of these businesses have operated retail fence businesses in the Mobile area utilizing the name and mark "Hurricane," and both have advertised in the area utilizing the name and the mark. [Plaintiffs' Exhibit 12; Defendants' Exhibit 35]. Additionally, both A–1 Hurricane Fence Company and Saraland Fence Company have received telephone calls intended for the other. Saraland Fence Company was aware of the defendants' use of the name and mark "Hurricane" for many years prior to Saraland's becoming a licensed dealer for the plaintiffs.

F. *Conflicting slogans of the plaintiffs and the defendants.*

36. Prior to 1977, the defendants had used certain slogans in their yellow page

advertisements such as "The largest independent fence company in the U.S.A." "Serving the Gulf Coast since 1948," "Dealers located in major cities throughout America," and "The fencing professionals since 1948." Testimony revealed that most, if not all, of the slogans are attributable to the plaintiffs. Raymond Schindler, President of HSI, testified that "the largest independent fence company in America" accurately describes HSI, since HSI supplies the widest variety of fence components. Also, HSI and its dealers have served the Gulf Coast since 1948, and HSI has been in business since 1948, while Rollins started up in 1967. The only characterization in the above-described slogans that does not accurately describe HSI is the averment that there are dealers in major cities throughout America, since HSI has dealers in only six states. Counsel for the defendants characterizes this discrepancy as "puffing," but the Court notes that the defendants actually have dealers only in Mobile, Huntsville, and Pascagoula, Mississippi.

37. Rollins explains the usage of slogans coined by HSI on the ground that when he took over the business in 1967 from his brother he merely continued the yellow page advertisements run by the former Hurricane dealership. Since that time, the advertisements have been continued from year to year with only minor changes. Rollins admits that the ads are misleading, for the defendants have not been in business since 1948, but he contends that the A–1 Hurricane Fence Companies that he and his brother operate may well be the largest independent fence company in the country, and that it is customary to engage in "puffing" in drawing up yellow page advertisements. Such "puffing" is noticeable in yellow page advertisements by other retail fence companies. [Defendants' Exhibit 35].

38. In the 1979 telephone directory for the Mobile area, Saraland Fence Company has a yellow page advertisement averring that it is the "only authorized factory dealer in Mobile area" and that it is the "largest independent fence manufacturer in the country." The ad utilizes the blowing man logo and the trade name and mark, and

asserts, apparently, that it has been in business since 1945. [Defendants' Exhibit 35]. The defendant A–1 Hurricane Fence Company, Inc.'s yellow page ad pushes "Fence-Craft of America," a trade name adopted by Rollins, and asserts that it has been in business since 1948. None of the other slogans mentioned above appear in the 1979 advertisement.

## G. Conclusion.

39. From the evidence adduced at trial before the Court, the Court finds that the defendant A–1 of Mobile was incorporated to do business as a licensed dealer of HFC/HSI products. The fact that there was no written agreement between the parties subsequent to 1969 is of little moment under the facts of this case, for it is clear that Rollins continued to hold himself out as an HFC/HSI dealer, taking no action that would indicate he thought of himself as anything else. This conduct was facilitated by the lack of control on the part of the plaintiffs, and there is no question but that Rollins received substantial commercial and economic benefit from his status as an apparent licensed dealer for Hurricane products. What relationship there was between the plaintiffs and Rollins was terminated when the plaintiffs first learned that he no longer deemed himself to be a licensed dealer, and the plaintiffs have since then licensed a competing dealer in the defendants' trade areas. The fact that there have been since 1977 two dealers in the south Alabama area utilizing the trade name and the mark has resulted in substantial confusion among the consuming public.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of the original complaint and the parties thereto by virtue of Title 28, U.S.C.A., § 1338(a), since this is a civil action raising substantial questions of patent law. The jurisdictional authority for consideration of the defendant's counter-claim and the third-party complaint is the same. Finally, the Court has authority over the

claims raised by the third-party defendant on its counter-claim and cross-claim by virtue of Title 28, U.S.C.A., § 1338(b) with respect to the counter-claim and Title 28, U.S.C.A., § 1332 with respect to the cross-claim.

■ 2. The first issue that must be addressed by the Court is the question of whether the plaintiffs, or either of them, are the owner of the name and the mark "Hurricane" and the "blowing man" logo. This is actually a standing question, for there can be no doubt but that an entity that is not the registered owner of a trademark has no cause to challenge the activities of others on contentions of trademark infringement. *See* Title 15, U.S.C.A., § 1114.

■ The defendants predicate their argument on this issue on the contention that HFC, the registrant of record of the mark, ceased using the mark in 1961 and that HSI is now the only entity with any possessory interest in such marks. HFC registered the mark in 1957, and this is, by law, prima facie evidence of ownership by virtue of Title 15, U.S.C.A., § 1057(b). *American Heritage Life Insurance Company v. Heritage Life Insurance Company*, 494 F.2d 3 (5th Cir. 1974). The defendants contend that all use of the mark since 1961 has been by HSI, resulting in an abandonment of the mark by HFC.

■ The Court is of the opinion that the defendants' contention on this point has little merit. HFC is the owner of the mark and HSI has exercised dominion over the mark as licensee of HFC. The mark "Hurricane" has been continuously protected by federal registration since 1957, and has been used by HFC in its business since as early as 1946. Both the federal and state registrations are valid and subsisting and have been since they were first registered in 1957. Finally, the Court is convinced that HFC and HSI are "related companies" under the terms of section 45 of the Lanham Act, Title 15, U.S.C.A., § 1127, and that use of the mark and name by HSI and its sublicensing of the mark and the name

do not affect the validity of the mark or its registration. Title 15, U.S.C.A., § 1055; *See also Turner v. HMH Publishing Company*, 380 F.2d 224, 229 (5th Cir. 1967).

3. With respect to the licensing of the mark to HSI, there can be no question under the law that HFC could be found to have abandoned its rights in the mark for failing to exercise the necessary controls over HSI as licensee. Such a result is implied in the Fifth Circuit's decision in *Turner, supra* at 229. However, under the facts of the instant case the Court is satisfied that the necessary control over use of the mark by the licensee was present. HFC is the registered owner of the mark and it is a partnership of two brothers. These brothers, along with two other brothers, incorporated HSI and control its activities. This interrelationship indicates sufficient control by the mark owner over the conduct and usage of the mark by the licensee/sublicensor.

■ 4. The valid registration of the mark does not create significant substantive rights, but it does provide a procedural advantage to the plaintiffs in that it creates a presumption that they have the exclusive right to the use of the name "Hurricane" and the "blowing man" logo, and, further, that the statutory prerequisites to a valid registration have been met to the extent that the mark is dissimilar to other registered marks for the same goods, the mark has acquired a secondary meaning, the mark is owned by the registrant, and the registrant has the exclusive right to use the trademark in connection with the goods specified. Title 15, U.S.C.A., § 1057(b). *American Heritage Life Insurance Company v. Heritage Life Insurance Company*, 493 F.2d 3, 10 (5th Cir. 1974); *Armstrong Cork Company v. World Carpets, Inc.*, 448 F.Supp. 1072, 1077 (N.D.Ga.1978).

■ 5. Since this is a trademark infringement action, the Court's first task is to determine whether the defendant's use of the name "Hurricane" and/or its prior use of the "blowing man" logo have created to any extent a likelihood of confusion, which is clearly a question of fact. *Arm-*

strong, supra, at 1077, *citing T.G.I. Friday's, Inc. v. International Restaurant Group*, 569 F.2d 895 (5th Cir. 1978) and *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445, 447 (5th Cir. 1973). The criteria relevant to this determination by the Court includes the type of trademark at issue, similarity of design, similarity of product, identity of retail outlets and purchasers, identity of advertising media utilized, defendant's intent and actual confusion. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381–82 (7th Cir. 1976); *Roto-Rooter Corporation v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975). And, while the Court has concluded above that there was no evidence of actual confusion between the plaintiffs and the defendants, the law is clear that proof of such actual confusion is not necessary, but rather the plaintiffs' burden is to establish that there was a substantial likelihood of confusion. *Scarves By Vera, Inc. v. Todo Imports*, 544 F.2d 1167, 1175 (2nd Cir. 1976); *Beef/Eater Restaurants v. James Borrough, Limited*, 398 F.2d 637, 639 (5th Cir. 1968).

From the evidence presented to the Court, the Court is satisfied that the plaintiffs have established the likelihood of confusion necessarily precedent to a finding of infringement. The plaintiffs have used their mark on the Gulf Coast, including Alabama, since as early as 1957. The trademark in issue, "Hurricane", has probably received greater recognition as describing chain link fence than as describing a fencing component manufacturer, but there can be no question but that the name has a value itself when used in connection with the fencing industry. There is no question but that the plaintiffs and the defendants are engaged in the same business of selling fence, although one is a manufacturer and the other is a retailer, and although one is limited to the chain link fencing while the other has a diversified business consisting of the erection of fences of all types. There is no dispute to the fact that the defendants have continually advertised that they sell "Hurricane" fences. And the Court is convinced from the evidence as a matter of fact that it was John Rollins' intent to

capitalize on the name "Hurricane" in connection with his fencing business even after he no longer deemed himself a dealer for HSI. There is thus no question but that the defendants' use of the mark "Hurricane", at least in the Mobile trading area, has created a substantial likelihood of confusion among the consuming public. Had the defendants merely adopted the name "Hurricane" under these circumstances, the infringement question would be easily answered, *see e. g. AMP, Inc. v. Foy*, 540 F.2d 1181, 1187 (4th Cir. 1976), but where, as here, the defendants have actually lawfully used the name or mark for a period of time, and then commenced unauthorized use, the finding applies *a fortiori*.

With respect to the defendants' Huntsville operation, the likelihood of confusion is not so substantial, since the plaintiffs have not engaged in the use of their mark in that area. However, from the facts elicited at trial the Court is convinced that the use of the name "Hurricane" in defendants' Huntsville operation was intended to take advantage of the name and mark of the plaintiffs which were already registered, and thus the use was likely to result in confusion.

6. On the basis of the foregoing, the Court is of the opinion that the defendants have infringed upon the plaintiffs' mark and that, absent excuse, the plaintiffs are entitled to injunctive relief to restrain such infringement.

7. In seeking to excuse their infringement, the defendants contend that the plaintiffs have abandoned their rights in the name and mark. In setting forth this defense, the defendants must bear the burden of establishing an intent to abandon on the part of the plaintiffs, for the defense of abandonment is similar to a forfeiture and the same strict burdens of proof apply. *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 128 (5th Cir. 1973); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir. 1963).

8. The thrust of the defense of abandonment asserted by the defendants

here is that the plaintiffs' lack of supervision, direction, and control over the defendants' use of the mark resulted in an abandonment of the plaintiffs' rights in the mark. There is no question but that the rights conferred by trademark ownership include the duty to exercise control and supervision over the licensee's use of the mark. *Sheila's Shine Products, supra* at 124, *citing Denison Mattress Factory v. Spring-Air Company*, 308 F.2d 403, 409 (5th Cir. 1962).

■ The defendants' argument is that the lack of a written agreement between the plaintiffs and defendants from 1969 to 1977, the defendants' failure to comply with terms of the previous agreements, the plaintiffs' failure to conduct any business in the trading areas of the defendants between 1969 and 1977, and the plaintiffs' lack of supervision over the defendants use of the mark during this period all contribute to the conclusion that the plaintiffs intended to abandon their mark in the defendants' trading areas.

The Court finds the lack of a written agreement and the defendants' failure to comply with the terms of the prior agreements to be unpersuasive of any intent to abandon on the part of the plaintiffs. There is no question but that the plaintiffs knew or reasonably should have known that Rollins had refused to sign the proffered 1969 dealer's agreement, and thus was not a contractual dealer of the plaintiffs' products after October 31, 1969. However, the defendants ask this Court to infer from this state of the facts that either by failing to obtain a contract from Rollins in 1969 or by failing to terminate him at that time the plaintiffs indicated an intent to abandon their trademark rights in Rollins' trading areas. This inference does not lie, the evidence rather supports the conclusion that the plaintiffs continued their course of dealings with the defendants on the assumption that the prior contracts were still in effect. The conduct of the parties indicates this since the course of dealings remained essentially unchanged even after there was no written agreement. The breaches of the

agreement by Rollins are also unpersuasive, since the record clearly shows that he paid little attention to the terms of the agreement even when it was in effect. While this may be evidence of lack of control, it cannot by itself establish any intent to abandon.

The defendants' third argument is also unpersuasive, since the Court cannot conclude as a matter of law that the plaintiffs have not been dealing in the defendants' trade areas. The plaintiffs' mark and name has been used in the sale of fencing along the Gulf Coast since 1957, and it was not until 1976 that the plaintiffs conceived that the defendants' use was contrary to the plaintiffs' interest. While, again, the lack of participation in this market might indicate a lack of supervision, it does in no way indicate any intent to abandon.

■ The most crucial issue going to the abandonment question is the lack of supervision over the defendants' use of the mark by the plaintiffs. In the *Sheila's Shine Products* case the Fifth Circuit stated that:

> The owner of a trademark has not only a right to license the use of his trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark. Failure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of unsupervised use. This principle is an analogue to the estoppel against a trademark owner who knowingly sits silently by while infringers use his trademark over a significant period of time.

486 F.2d at 123–124 (citations omitted). The extent of control and supervision that the mark owner must have has also been discussed by the Fifth Circuit, which concluded that the question is whether the mark owner has, with respect to the alleged infringor, "abandoned quality controls." *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 387 (5th Cir. 1977). The Court does not, on the facts presented here, find such an abandonment of quality

control by the plaintiffs with respect to the defendants' use of the plaintiffs' marks. Under the terms of the original written agreement, the defendants were authorized to utilize the mark only in connection with the advertising, sale, and erection of fencing products manufactured by the plaintiffs. Clearly plaintiff HSI has extensive quality control over this use of the mark, since it supplied the products to which the mark was authorized to be affixed. A thornier question is presented by the defendants' use of the mark in the advertising, sale, or erection of products not manufactured by HSI, since it would have no way of insuring its quality. However, since such use was not authorized by the plaintiffs, they cannot now be said to have forfeited their mark for failing to supervise its use when such uses were not authorized. The real concern is why it took the plaintiffs ten years to ascertain that the mark was being improperly used, when stringent supervision over the plaintiffs' operation would have detected this. The defendants strongly contend that this lack of supervision is controlling. However, this Court sits as a court of equity in determining trademark infringement questions, and the equities on this point clearly weigh in favor of the plaintiffs. The plaintiffs have numerous licensed dealers throughout the country and to impose upon the mark owner the duty of monitoring every sale of every dealer to regulate its use of the mark would be unconscionable. In this case the evidence is clear that the defendants intentionally expropriated the plaintiffs' mark with the intent of capitalizing on the mark for their own benefit, and they never communicated to the plaintiffs that they were or that they intended to be other than licensees of the plaintiffs. The fencing business is unique and only minimal quality controls ought to be required. The Court is of the opinion that the plaintiffs have established sufficient controls, and accordingly the Court is convinced that the defense of abandonment is without merit.

9. The defendants have also raised the issue of laches as a defense to the primary infringement action, contending that if any infringement occurred it first occurred in 1969 and that the plaintiffs have sat on their rights too long. The Court is of the opinion that the laches defense is also without merit, for the defendants made no factual issue of prejudice, a necessity to a laches defense. The only evidence on this point was that the defendants had spent great sums of money in advertising the Hurricane name, but this amounts to no prejudice since this was the agreement between the plaintiffs and the defendants, and since the result of such advertising has been business for the defendants. Nor is mere delay relevant, since the evidence readily reveals that while Rollins was a knowing infringer in 1969, the plaintiffs did not have actual knowledge of the infringement until 1976 or 1977. The Court does not find the delay by the plaintiffs in this case from the time that they learned of the infringement until the time suit was filed as amounting to such a "virtual abandonment of the right by the plaintiff for a long period of time that the balance of the equities would favor the knowing infringer." *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965). Thus the Court concludes that the defense of laches is unavailable to the defendants in this action.

10. The Court having concluded that the defendants have infringed upon the plaintiffs' trademark and name and that such infringement is not excusable by virtue of any of the defenses raised by the defendants, the Court hereby ORDERS that the defendants A–1 Hurricane Fence Company, Inc. and A–1 Hurricane Fence of Huntsville, Inc., be and the same are hereby ENJOINED and RESTRAINED from using in connection with the advertising, sale, and erection of any fencing goods the "blowing man" logo and the name "Hurricane", or any other colorable imitation of the plaintiffs registered mark.

11. The plaintiffs also contend that they are entitled to monetary relief in the form of damages measurable by reference to the profits of the defendants resulting from the infringement, contending that

such amount would be equal to the profits received by the defendants from April of 1977 to this date. Such a recovery is predicated upon Title 15, U.S.C.A. § 1117, which provides, in pertinent part, that:

When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this Title, and subject to the principles of equity, to recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . .

The Court views this statute as directed toward punishment of the infringer for his malicious or wilful interference with the mark owner's rights, and as providing a remedy to the mark owner for damages suffered as a result of the infringement. Sitting as a Court of Equity in this matter, the Court is of the opinion that the evidence failed to establish any monetary damage to the plaintiffs as a result of the infringement, and that collection of the defendants' profits would thus in no way serve to compensate the plaintiffs for any actual loss, but would amount rather to unjust enrichment of the plaintiffs. The Court does, however, conclude that the intentional infringement by the defendants cannot be ignored, and that imposition of all costs of action against the defendants is a fair and just remedy. Such a remedy punishes the defendants for their improprieties without rewarding the plaintiffs, who have no established propriety in this action. Accordingly, the Court hereby orders that all costs of this action between the plaintiffs and the defendants be taxed against the defendants.

### A–1 Hurricane Fence Company's Counterclaim and Third Party Complaint

12. In its counter-claim and third-party complaint A–1 Hurricane Fence Company contends that HFC/HSI and Saraland Fence Company are infringing on its trade name, and A–1 requested injunctive relief restraining such action and damages for losses suffered. The Court's conclusion, *supra*, that HFC is the valid registrant and owner and that HSI is a valid license/sublicensor of the mark effectively precludes the claims raised in this countersuit and third-party complaint. The defendants having no right to the use of the mark have no standing to object to use of the marks by others.

### Saraland Fence Company's Counterclaim and Cross-claim

13. Third-party defendant Saraland Fence Company has filed a counterclaim and cross-claim in response to the third-party complaint, contending that it is entitled to recover from A–1 Hurricane Fence Company for interference with its business relationship with its clients and that, alternatively, it is entitled to breach of contract relief against the original plaintiffs since Saraland had been induced to enter into a dealer agreement on the basis that it would receive exclusive rights to the "Hurricane" mark in the Mobile area. The Court's conclusion, *supra*, effectively disposes of the cross-claim, for the substance of the Court's decision indicates that Saraland did receive exclusive rights to the mark in this area and that its remedy is against A–1 Hurricane Fence Company for infringement. On the counterclaim the Court is of the opinion that A–1 did, by infringing the trademark, interfere with Saraland's business relationship with its customers. However, the evidence did not establish that Saraland suffered any calculable damage, but rather that both A–1 and Saraland encountered confused customers. On this basis, and in view of the equitable nature of the proceeding, the Court is of the opinion that no damage award need be made since imposition of costs against A–1 would be a sufficient remedy. Accordingly, it is hereby ORDERED that all costs of action of the third-party complaint be and the same are hereby taxed against the defendants and third-party plaintiffs.