**AMERICAN SLEEK CRAFT, INC., Plaintiff,**

v.

**Bruce NESCHER and Conquest Boats, Inc., Defendants.**

**Bankruptcy No. CIV 91–0115–PCT–CAM.**

United States District Court,
D. Arizona.

Sept. 12, 1991.

Donald M. Peters, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., for plaintiff.

Michael L. Rhees, Phoenix, Ariz., for defendants.

## ORDER

MUECKE, District Judge.

Having considered all the testimony and evidence presented to the Court, all the memoranda and proposed findings of fact and conclusions of law filed with the Court, the Court concludes as follows:

## FINDINGS OF FACT

On January 23, 1991, plaintiff, American Sleek Craft, Inc. ("American"), filed a complaint and petition for order to show cause why a preliminary injunction should not be issued enjoining defendants from using the names "Sleek Craft," "Sleek Craft Boats by Nescher," or any similar names in connection with the manufacture, distribution and sale of boats.

American is a California corporation with its principal place of business in California. It is the successor to a business that sold boats under the names "Sleek Craft" and "Sleek Craft Boats by Nescher." The predecessor corporation, Sleek Craft Boats by Nescher, Inc., became the debtor in a Chapter 7 bankruptcy proceeding in California.

Defendant Bruce Nescher ("Nescher") resides in Lake Havasu City, Arizona, and is an employee of defendant Conquest Boats, Inc. ("Conquest"). Conquest is an Arizona corporation with its principal place of business in Arizona. Conquest, like American, makes boats, which it markets under the name "Sleek Craft."

Nescher first adopted the trade name "Sleek Craft" in 1968 and manufactured boats as a sole proprietor until 1980. In the mid–1970s, Nescher adopted the second trade name, "Sleek Craft by Nescher." In June, 1980, Nescher and two other individuals formed a corporation called Sleek Craft Boats by Nescher, Inc ("SBBN" or the "Corporation"). At that time, Nescher, as an individual, ceased to be involved in the manufacturing of boats. SBBN made the same boats Nescher had made individually, using many of the same employees, and selling the boats through the same network of dealers. Nescher worked solely through SBBN and derived his livelihood from a share of the Corporation's income. Nescher was the sole stockholder of SBBN, and its chairman of the board. He later became president.

On or about the time SBBN was formed in 1980, Nescher leased his boat molds, equipment, and tools to the corporation. He also transferred unfinished boats and certain materials to SBBN outright. Although not mentioned in the agreement between Nescher and SBBN, Nescher also contributed skill, expertise and labor to SBBN. In short, Nescher essentially ran SBBN by maintaining control over the production of the boats and its day-to-day operations. He did this throughout the Corporation's history.

For the next decade, SBBN proceeded to make and sell boats. There were no express agreements concerning any of the names between Nescher and SBBN.

In February, 1989, SBBN filed bankruptcy pursuant to Chapter 11, with Nescher as its debtor in possession. This proceeding was later converted to Chapter 7. In November 1989, while Nescher still ran SBBN as debtor in possession, he caused certain boat-making equipment to be leased to Conquest Boats in Lake Havasu City, Arizona, without the knowledge of the bankruptcy court. The document reflecting the transfer characterizes it as a lease of equipment from SBBN to Conquest. Nescher testified variously that the actual lessor was himself individually or a corporation he owns by the name of Ben Enterprises, Inc.

In the summer of 1990, while the bankruptcy was pending, Mr. Roger Finney of Conquest, after discussing the matter with Nescher, formed an Arizona corporation called "Sleek Craft, Inc.." There is some dispute as to whether the corporation was formed to protect the name Sleek Craft from the bankruptcy court. In testimony before the court, Nescher testified that "[t]he purpose of the corporation was to be able to market Sleek Craft boats." (Transcript ("TR"), at 126). Yet, in a deposition that was read into the record of this case, Nescher stated:

Question: What is your understanding of how the formation of that corporation

would offer some protection against bankruptcy?

Answer: Well, because we would have Sleek Craft Boats, an Arizona corporation, and be entitled to use the name Sleek Craft Boats, regardless of what the courts did, because we were fighting in court about the name and stuff like that. . . .

(TR, at 128). Despite Nescher's suggestion that there was a fight in the bankruptcy court over the name, no such evidence was provided and Nescher himself stated that there was no such fight. TR, at 129.

During the same summer that Conquest was formed, Nescher resigned as president of SBBN in an effort to forestall a potential conversion from Chapter 11 to Chapter 7 bankruptcy. After Nescher's resignation, SBBN approached the individuals who later became the principals of American and suggested that they acquire the assets of SBBN. The proposed sale would have been with warranty of title. The agreement expressly provided that SBBN would sell American "the name 'Sleek Craft Boats by Nescher,' and any similar name owned by Debtor, including the name 'Sleek Craft.'" (fifth page of Exhibit 10). Nescher received notice of the proposed sale and filed a written objection, claiming ownership rights to some of the tangible assets. The basis for Nescher's objection was that the assets had simply been leased to SBBN.

Nescher's opposition to the proposed sale raised no objection concerning the sale of the trade names. He made no suggestion that the name was really his rather than the Corporation's. He did not object to the portion of the proposed agreement where SBBN represented that it owned the trade names and was in a position to sell them. Although Nescher was present in the bankruptcy court for many of the proceedings dealing with the proposed sale, neither he nor his attorney ever made oral or written objection to the sale of the trade names.[1]

The Court finds that on the issue of whether Nescher or his attorney had objected to the sale of the trade names, Nescher's testimony was not credible. Nescher's answers to questions on this issue and, for that matter, during the entire proceeding, were either evasive or non-responsive, even when directed by the Court to answer the question asked. For example, with respect to the instant issue, the following exchange took place:

Q [Plaintiff's counsel]: Did you ever, on any of those occasions, either yourself or through your attorney, say wait a minute, you can't sell the name, that's mine; or anything to that effect?

A [Nescher]: The attorney turned in the paperwork to the courts as soon as the meeting was over.

Q: By turning in the paperwork, are you referring to this objection that we've been talking about?

A: Yes.

Q: Which you've agreed doesn't say anything about the name, correct?

THE COURT: Goes to the question, again, was—did you any time, at any of the meetings, ever object to selling the name. And you didn't answer it again.

THE WITNESS [Nescher]: Yes, the— Dave Pittman, my attorney objected to it.

THE COURT: You mean he did so orally?

THE WITNESS: Well, he sat there and said that he didn't present the paperwork before the meeting because we didn't know that there was an offer in there to do it, and so then—

THE COURT: Excuse me.

THE WITNESS: —after they made the offer—

THE COURT: Did they make it to the court? I mean you could sit there and talk with your lawyers and your friends and everybody else you wanted to. It would have nothing to do with the record in this court. Did you ever object on the record to the Court about the name being sold?

---

1. This may be explained in part by the fact that Nescher believed that the formation of "Sleek Craft, Inc." in Arizona would allow him to use the names in competition with any successor to SBBN regardless of what the bankruptcy court did. TR, at 128.

THE WITNESS: I believe so.

THE COURT: Well, I'd like you to produce that before I decide this case. I want a copy of the record, the bankruptcy record where he did that. I want a certified copy of it.

\* \* \* \* \* \*

Q [Plaintiff's counsel]: You recall as you sit here that your attorney said something, by way of objection, to the name being sold?

A [Nescher]: Yes, he went to court with me and got up in my behalf with the courts and made his arguments as—along with everybody else.

Q: Are you saying that as you sit here you recall him saying something to the effect that the name could not be sold?

A: I don't know whether he said anything about the name or not.

THE COURT: Well, that's what you just told me he did, and that's why I asked your lawyer to get me a certified copy of that from the record.

THE WITNESS [Nescher]: I would have to see what he actually did at the courts.

THE COURT: Well, he either did or he didn't.

(TR, at 137–140).[2] Under the circumstances and in light of Nescher's lack of candor, the Court is convinced that Nescher was content simply to see American

contribute money for the benefit of the creditors of Nescher's bankrupt company, SBBN. Nescher apparently thought he could wait until after the payment was made to tell American that in his view it had purchased little or nothing.

In light of Nescher's objection to the sale of some tangible assets, American investigated his claims and decided to proceed with the sale nonetheless. At the time of the proposed and actual sale, plaintiff was aware that a Mr. Forrest Pittard was the individual representing SBBN as debtor in possession. American proceeded with the sale because it believed that the more important assets had all been created after 1980.[3]

American paid the bankruptcy trustee $335,000 [4] in cash for the bankruptcy estate's right, title and interest in and to specified tangible assets, "together with the estate's right, title and interest in and to the name 'Sleek Craft Boats by Nescher,' or any similar name used by the debtor, including the name 'Sleek Craft.'" (Exhibit 1). The Trustee's Certificate of Sale conveyed to American

> for the sum of $335,000 cash, without warranty or recourse, the bankruptcy estate's right, title and interest in and to certain personal property consisting of ... molds, ... together with the estate's

---

2. Nescher's inability or unwillingness to be candid with the Court also is illustrated by the following exchange dealing with whether Conquest ever paid Sleek Craft, Inc. for the molds that were leased to Conquest by—according to Nescher who again was being evasive—both himself in his individual capacity and Sleek Craft, Inc.:

> Q [Plaintiff's counsel]: Do you know if Conquest has ever paid Sleek Craft Boats by Nescher, Incorporated anything by virtue of this lease?
> A [Nescher]: Sleek Craft Boats, Incorporated never bought any product from Conquest Boats. And as far as what Conquest Boats has produced, any of those royalties that would have been paid to it, would have went to the estate, and the estate is out of business.
> Q: Is the answer that Conquest, therefore, has not paid the estate of the bankrupt corporation anything?
> A: That's true.
> Q: Who has it paid? Has it paid anyone the consideration due under this lease?

> A: No.
> Q: Have you ever made the bankruptcy trustee aware of the fact that the estate might have some income coming to it by virtue of this?
> A: I have made a lot of conversations to the bankruptcy court about the $400,000 worth of boats that disappeared as well as a lot of the other assets.
> Q: Did you in fact ever—
> THE COURT: Excuse me. You didn't really answer the question again.
> THE WITNESS [Nescher]: Okay.
> Q [Plaintiff's counsel]: Well me take it two steps—
> A: No.
> THE COURT: Please listen to the question and answer it. I'd appreciate it. Okay?
> (TR, at 124–25).

3. Nescher's objection arose from a 1980 lease, and American believed that the more important assets had all been created after that time.

4. American increased its original offer by $75,-000.

right, title and interest in and to the name "Sleek Craft Boats by Nescher", or any similarly name used by the debtor, including the name "Sleek Craft."

(Exhibit 1). At no time prior to the consummation of the sale had any suggestion been made that SBBN had erred when it represented that the trade names were corporate assets.

Since its purchase, American has continued the business of SBBN. It sells the same boats SBBN made, has many of the same employees, uses the same dealers and represents itself as the successor to SBBN.

Conquest and Nescher also make boats which they call "Sleek Craft" boats. Nescher claims that the trade names never belonged to SBBN and are instead owned either by him or by his wholly owned corporation, Ben Enterprises, Inc.[5]

CONCLUSIONS OF LAW

This is a civil action brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the common law tort of unfair competition. The Court has jurisdiction over this dispute by virtue of 28 U.S.C. §§ 1331, 1332, and 1338.

■■■ "A claim for relief arises under § 1125(a) if defendant affixes to its goods any false description or representation, including a false designation of origin, in a manner likely to cause confusion or to deceive consumers into thinking that plaintiff is the source of defendant's goods." *Decorative Aides Corp. v. Staple Sewing Aides*, 497 F.Supp. 154, 159 (S.D.N.Y.1980), *aff'd*, 657 F.2d 262 (2d Cir.1981) (citations omitted). Similarly, an unfair competition claim "rests in a showing that the defendant is passing off his goods or services as those of the plaintiff by virtue of a substantial similarity between the two, resulting in confusion on the part of potential customers." *Reddy Communications v. Environmental Action*, 477 F.Supp. 936, 948 (D.D.C.1979).

■■■ Two distinct and unrelated companies are selling similar boats under the same trade names, both attempting to profit from the good will which is associated with that name. These facts are sufficient to warrant an inference that there is a likelihood of confusion. *See D C Comics, Inc. v. Powers*, 465 F.Supp. 843, 848 (S.D.N.Y.1978). The Court finds that the use of the same trade names to describe very similar products has a tendency to mislead, confuse or deceive. *See R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.*, 511 F.Supp. 867, 875 (S.D.N.Y.1980) (discussing applicable test). An injunction is a proper remedy if plaintiffs' claim to the trade names in question is superior to that of defendants. *See National Lampoon, Inc. v. American Broadcasting Companies, Inc.*, 376 F.Supp. 733, 750 (S.D.N.Y.), *aff'd*. 497 F.2d 1343 (2nd Cir.1974); *Russ Berrie & Company v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 989–90 (S.D.N.Y.1980).

The central issue is whether the trade names are a corporate asset of the bankrupt corporation, SBBN. If SBBN owned the trade name, then American is correct that it now, as a result of the bankruptcy sale, owns the exclusive right to use the subject trademark. However, if the Corporation merely possessed a leasehold interest in the trademark, as Nescher contends, then American only has a license to use the trademark.

■■ Although Nescher coined the name "Sleek Craft," that fact is not dispositive. Ownership of a trade name depends upon usage, not creation. "Mere conception of the term gives no trademark rights and it is the actual use in connection with a particular business which is required." *Montgomery v. Kalak Water Company of New York, Inc.*, 196 F.Supp. 173, 177 (S.D.N.Y.1961).

■■ The law presumes that when a business is conveyed, its trade name and good will are also conveyed. *Plitt Theatres, Inc. v. American Nat'l Bank & Trust Co.*,

---

**5.** Again, Nescher's lack of credibility should be noted. For example, he testified variously that SBBN leased the molds from him individually and from Ben Enterprises, Inc. (*See* TR, at 144–45).

697 F.Supp. 1031, 1034–35 (N.D.Ill.1988) ("Ownership of trademarks and service marks passes impliedly with ownership of the pertinent building or business with which the mark is associated, absent express provision to the contrary."). The reason for the presumption is that "[g]ood will has no existence except in connection with a going business; it cannot be separated from the going business to which it is incident." *Pfleghar Hardware Specialty Co. v. Blair*, 30 F.2d 614, 616–17 (2nd Cir. 1929). "Unless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one to whom the business has been transferred." *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 670 F.Supp. 795, 798 (N.D.Ill.1987), *aff'd* 871 F.2d 697 (7th Cir.1989); *see also* 1 McCarthy, *Trademarks and Unfair Competition* § 18.12 (2d ed. 1984).

In addition, it has generally been acknowledged that the trademark of a bankrupt cannot be sold apart from the good will or assets of a corporation, for if the tangible assets of a bankrupt are sold without good will or trademarks, the trademark ceases to exist:

> The trademark of an insolvent or bankrupt cannot be sold apart from the good will symbolized by that trademark. If the tangible assets of a bankrupt are sold without good will or trademarks being sold, the trademark ceases to exist. If the purchaser does not carry on the business, the good will and trademark cease. "Where the business goes, the trademark goes, whether in life or death." If the buyer of the bankrupt's assets does not continue the business, the marks and good will are abandoned, and anyone, including the bankrupt, can then appropriate anew the trademark rights.
>
> On the sale of a whole business in bankruptcy, trademarks impliedly pass to the buyer of the whole tangible assets, even though not specifically mentioned in the contract of sale.

1 McCarthy, *Trademarks and Unfair Competition* § 18:9, at 818 (footnotes omitted).

Until 1980, Nescher had the right to use the trade names in question. After 1980, however, Nescher no longer could use the trade name because he had transferred his ongoing business to the newly formed corporation, SBBN, which became the sole maker of Sleek Craft boats.

Nescher argues that the presumption transferring good will and trademarks should apply only when there is a "sale" of the business. Nescher's Memorandum, at 3. While it is true that the presumption is applied, for the most part, in cases involving the sale of a business, it is also true that the presumption has little, if anything, to do with the type of consideration that accompanies the transfer of the business. A trademark or trade name is merely a symbol of good will. It "has no independent significance apart from the good will it symbolizes." 1 McCarthy, *Trademarks and Unfair Competition* § 18.1, at 793. "Good will ... cannot be separated from the going business to which it is incident." *Pfleghar*, 30 F.2d at 616–17. Thus, the presumption simply means that the good will and the name that symbolizes it will be presumed to stay with the business unless a contrary arrangement is shown.

A rather similar case to the instant one makes it clear that the presumption should apply here. In *Jackson Corset Co. v. Cohen*, 38 App.D.C. 482 (1912), an individual created and used a trademark in connection with his business for many years, and then formed a corporation and became its president. The individual transferred his business to the corporation, which continued to manufacture the same goods. There was no formal transfer of the trademark. The corporation subsequently became bankrupt, and the president—like Nescher in this case—argued that he had licensed the trademark to the corporation. The court rejected the argument, reasoning that on such facts the law presumes that ownership of the trademark was transferred to the corporation:

> While, under certain conditions, a limited interest by way of license may be created in a trademark, the transfer of a plant,

business, and good will, under such conditions as surround the transfer in the present case, necessarily, by operation of law, carries with it the right to the trademark upon which the business is founded.

*Id.* at 484 (citations omitted); *see also Smith v. Tobacco By–Products and Chemical Corporation,* 243 F.2d 188, 191 (CCPA 1957) (court affirmed denial of appellant's right to register trademark where appellant argued that he was the individual owner of the trademark and the corporation of which he was president only had the right to use it). Under the circumstances, the court finds the presumption transferring good will and trade names applicable to this case. The names Sleek Craft Boats by Nescher and Sleek Craft presumptively became assets of SBBN when Nescher's individual business was transferred to SBBN, absent evidence of a contrary arrangement.

Nescher provided no evidence that he expressly licensed the trade name to SBBN. However, he argues that an implied license should be found in this case. An implied agreement that has the effect of retaining ownership of all significant assets in Nescher, leaving the corporation he formed with little but liabilities, is inconsistent under the circumstances of this case. Under both Arizona and California law, courts will find an implied promise only when the implication is indispensable to effectuate the intention of the parties, and where such a promise was so clearly within the contemplation of the parties that they deemed it unnecessary to express it. *Walgreen Arizona Drug Co. v. Plaza Center Corp.,* 132 Ariz. 512, 647 P.2d 643, 647 (App.1982); *Lippman v. Sears, Roebuck & Company,* 44 Cal.2d 136, 280 P.2d 775, 779 (1955). Here, it is not necessary to find that the trade names were licensed rather than assigned for the arrangement between Nescher and SBBN to make sense. The evidence presented shows that Nesch-

er leased some assets, transferred others outright, and made various continuing contributions to SBBN in return for a share of the company's income and all of its stock. Nescher's contributions to the corporation took different forms, and the pertinent facts provide no basis for concluding that the trade names were intended to be handled in a particular way.

In addition, Nescher's subsequent conduct (i.e., forming Sleek Craft, Inc. in Arizona) and his lack of credibility lends no support to his claim that he orally licensed the trade names to SBBN. Notwithstanding that other courts have found similar claims to be improbable, *see White Satin Mills Corp. v. Woodward,* 34 F.2d 158 (D.Minn.1929), *aff'd.* 42 F.2d 987 (8th Cir. 1930), Nescher did not present any evidence, even remotely suggesting that there was an oral license. Instead, the evidence establishes that when the corporation was formed, the parties simply assumed that SBBN would use the trade names. There were no explicit agreements, oral or written, on the subject. Moreover, Nescher's action in forming Sleek Craft, Inc. in Arizona to protect the name (TR, at 128) is inconsistent with Nescher's claim that he still owned it individually. If Nescher believed the name belonged to him, then there was no reason to attempt to protect it from the bankruptcy court. Also, Nescher did not identify the name as an asset in his individual bankruptcy filings. In short, there is no evidence that, after the creation of SBBN, Nescher ever claimed the names were his except in this dispute with American.

Nescher cites several cases that are "dispositive" of the issue as to "whether a trade name remains with the individual or passes to the corporate manufacturer under circumstances similar to the one at bar." Defendants' Memorandum in Opposition to Plaintiff's Proposed Findings of Facts and Conclusions of Law, at 6.[6] *See,*

---

6. It should be noted that such significance was not attributed to these cases in defendants' proposed findings of facts and conclusions of law. Defendants initially cited these cases for the proposition, which is inapplicable here, that the "[u]se of a tradename by a controlled corporate

licensee, even exclusive use, inures to the benefit of the individual licensor and does not divest the licensor of ownership of the name." Defendants' Proposed Findings of Fact and Conclusions of Law, at 6–7.

*e.g., Floater Vehicle, Inc. v. Tryco Mfg. Co.,* 497 F.2d 1355 (CCPA 1974) (an individual who has been in business and owns a particular mark and then enters employment owns the mark rather than the employer); *Hurricane Fence Company v. A–1 Hurricane Fence Company, Inc.,* 468 F.Supp. 975 (S.D.Ala.1979) (a partnership that forms a corporation and licenses the corporation to use its trade name retains ownership even though all subsequent use of the mark is by corporation); *In re Briggs,* 229 U.S.P.Q. 76 (1986) (based on uncontroverted facts, court approved application to register trademark, finding that applicant was the owner of the mark sought to be registered); and *In re Hand,* 231 U.S.P.Q. 487 (1986) (court allowed registration of trademark when individual wholly owned subsidiary corporation and no information inconsistent with such a claim was contained on the registration application).

None of the cases support Nescher's contention. *Floater Vehicle* involves an express, written agreement concerning the parties' respective rights to a trademark, and the central issue was what that particular contract meant. 497 F.2d at 1357. Here, it is undisputed that there were no agreements; the question is what legal presumption is applicable and how it affects the parties' rights. In *Hurricane Fence Co.,* the court was concerned, among other things, with abandonment of the trade name, which is not the issue here.[7] Also, the case involved a situation in which there was apparently no dispute concerning the licensing of the trademark. 468 F.Supp. at 986. Here, the primary dispute concerns whether or not Nescher licensed the trade names to SBBN. In *In re Briggs,* it was "uncontroverted" that the individual claiming ownership "allowed [the corporation] to use the mark pursuant to an oral license." 229 U.S.P.Q. at 77. The corporation expressly assented to the truth of this claim. *Id.* Here, there is no such stipulation and no credible evidence was presented that such a license ever existed or was ever granted. Finally, *In re Hand* concerned

what evidence of ownership would be acceptable when a purported owner attempted to register a trade name. 231 U.S.P.Q. at 488. In *Hand,* unlike the instant case, there was no suggestion that the business in question had ever been transferred from an individual owner to the corporation.

American also claims that Nescher should be estopped from now claiming ownership of the trade names due to his failure to voice any such claim when American was buying the names. Nescher responds that American's failure to plead estoppel, whether promissory or equitable, precludes it from now relying on this doctrine. Nescher's argument is unpersuasive. American has not asserted any *claim* of estoppel; rather, it has argued that Nescher should be estopped from arguing a particular *defense,* i.e., that the names were really his by virtue of an implied license. Where no responsive pleading is required and where plaintiff asserts estoppel to avoid the effect of a defense asserted by defendant, estoppel need not be pled. *Colonia Verde Homeowners Association v. Kaufman,* 122 Ariz. 574, 596 P.2d 712 (App.1979); *accord Midwest Management Corp. v. Stephens,* 291 N.W.2d 896 (Iowa 1980) ("Because [plaintiff] was not required to file a reply to defendants' ... affirmative defenses, it could assert its estoppel theory at trial."). Further, Nescher's suggestion that American is arguing promissory estoppel is misplaced. American argues for an equitable estoppel.

In addition, Nescher argues that caveat emptor precludes American's use of estoppel. This doctrine has little, if anything, to do with this case because American is not seeking relief from the transaction. The cases cited by Nescher, *e.g. Hagan v. Gardner,* 283 F.2d 643, 646 (9th Cir.1960) (mortgage foreclosure, sale, execution and delivery of quitclaim deed by bankruptcy trustee did not affect title to property held by successor of original mortgagors where grantee of original mortgagors was not made a party to foreclosure proceedings);

---

7. Nescher argues that he did not abandon the trade name. However, American has never claimed that the doctrine of abandonment applies in this case.

*Checkley & Co. v. Citizens Nat'l Bank of Decatur,* 43 Ill.2d 347, 253 N.E.2d 441 (1969) (where deficiency in size of tract acquired at judicial sale was due to mistake as to state of title and there was no fraud, misrepresentation or mistake of fact, risk of the defect was borne by purchaser), generally concern whether a buyer can be relieved from a transaction due to dissatisfaction with what he bought. They do not concern a situation in which a debtor allows a sale to be consummated for the benefit of his or her creditors, secretly knowing that the buyer is being misled, and then gleefully reveals his or her secret after the cash has been paid.[8]

 Under equitable estoppel, a party is estopped from asserting rights that otherwise may have existed against another person who in good faith has relied upon the party's conduct and as a result of such reliance has changed his position for the worse.[9] *Heltzel v. Mecham Pontiac,* 152 Ariz. 58, 730 P.2d 235, 237 (1986). Nescher's lack of credibility and his subsequent conduct after SBBN went into bankruptcy lead this court to conclude that Nescher, believing that he could use the names regardless of what the bankruptcy court did, was content to allow American to pay $335,000.00 for the benefit of the creditors of Nescher's bankrupt corporation without mentioning that part of what American was buying was, in Nescher's view, really his. Thus, the court finds that Nescher's failure to object to the sale of the trade names when he was identifying his objections to the proposed sale is inconsistent with the position that he now attempts to take. American relied to its detriment upon Nescher's failure to object under circumstances when any objection should reasonably have been voiced. Therefore, Nescher is estopped from claiming individual ownership of the trade names in question.

Nescher also claims that even if SBBN had owned the trade names, its sale to American is invalid because it would be without the distinctive product the name is associated with. Nescher's Opening Memorandum, at 14. In effect, Nescher contends that American holds an ineffective assignment in gross.[10]

 The sale of the trademark apart from the goodwill symbolized by the trademark is known as an "assignment in gross." An assignment in gross is invalid and passes no right to the purported assignee. 1 McCarthy *Trademarks and Unfair Competition* § 18:5, at 806. In determining whether an assignment is "in gross," the test is whether the assets bought are sufficient to enable the buyer to go on in real continuity with the past. *See Merry Hull & Co. v. Hi–Line Co.,* 243 F.Supp. 45, 51 (S.D.N.Y.1965); 1 McCarthy *Trademarks and Unfair Competition* § 18.9, at 818–19.

In 1980, Nescher entered into a written agreement with the corporation whereby he leased molds, tools and equipment to the corporation. Based on the "lease," Nescher argues that the corporation only had a revocable leasehold interest in the distinc-

---

**8.** In his discussion concerning caveat emptor, Nescher states that "Plaintiff clearly did not avail itself of all means of information available to ascertain the extent of title." Nescher's Memorandum, at 12. This statement is incorrect because SBBN affirmatively represented to American that it did own the trade names and had them to sell. Although no similar statement was made in the final sale document, the representation that SBBN owned the names was never rejected by SBBN, objected to by Nescher or otherwise called into question. Notice of the proposed sale was sent to interested parties, including Nescher, so that any objections could be voiced. This court is convinced that American diligently investigated the claims which Nescher *did* make in response to such notice, and it was reasonable for American to assume that Nescher had voiced such objections as he had.

**9.** Nescher cites California case law that suggest four fixed elements for an estoppel. Although the parties did not directly address the choice of law issue relating directly to estoppel, it does not appear to matter because California, Arizona and Federal law all appear to take the same view of the doctrine. 31 C.J.S. *Estoppel* § 59.

**10.** This argument, which was discussed in Nescher's Opening Memorandum, was not presented at the permanent injunction hearing nor in Nescher's proposed findings of facts and conclusions of law.

tive molds. Under the Trustee's Certificate of Sale American received the trade names in conjunction with the other assets that permitted it to carry on the business of the bankrupt corporation, which is in fact what American has been doing. American operates out of the same offices that SBBN operated out of, and it represents itself as carrying on the business of SBBN. In short, nothing resembling an assignment in gross appears to have occurred in this case.

Even assuming the lease evidences Nescher's desire to retain ownership of at least some of the assets, such a lease often carries little weight, at least with respect to whether the good will and names become corporate assets:

> [C]ourts will look to the reality of the transaction to see if "good will" passed.... *[T]he emphasis should not be on formalistic transfer of bits and pieces of tangible assets, but upon whether the assignee will probably go on in real continuity with the past.* The focus should be on protecting customers' legitimate expectation of continuity under the mark, not on searching for a "stereo-typed set of formalities." As one commentator observed, "The emphasis must be laid not upon ceremony but upon the substance of the transaction, to the end that deception of the public will be avoided and the transferee will receive all of the indicia of the goodwill of the business symbolized by the mark assigned."

1 McCarthy *Trademarks and Unfair Competition* § 18:7, at 813–14 (emphasis added and footnotes omitted). Under the circumstances of this case, the "reality of the transaction" make it clear that the trade names became corporate assets that were transferred to American. Nescher's "lease" of certain boat molds cannot overcome the legal presumption that the trade names became corporate assets. Indeed, the "lease" makes Nescher's oral-license theory *less* probable, for if Nescher went to the trouble of preparing a written document leasing certain boat molds to SBBN, he certainly could have included the trade names in that document or prepared another document leasing the trade names.

Finally, Nescher claims that even if estoppel can be asserted against him, it cannot be asserted against Conquest Boats because Conquest was neither a party to the bankruptcy nor put on notice of any proposed sales. No evidence was presented that Conquest had any claim to use the trade names other than what it derived from Nescher and/or the formation of "Sleek Craft, Inc." in Arizona which, as indicated earlier, was formed to evade any actions by the bankruptcy court. The formation of "Sleek Craft, Inc." does not give Conquest the right to use the trade names. Also, Nescher's claim that "[t]he evidence supports a three year license for Conquest to use the names" (Proposed Findings, at page 11) is misplaced. Nescher did not provide any evidence to support the existence of any license of the trade names to Conquest. The evidence that was presented indicates that Conquest *knew* that the trade names were apparently an asset of the bankrupt corporation, SBBN; indeed, it was that knowledge which prompted the attempt by Nescher to secure a right to the trade names by creating "Sleek Craft, Inc." with Mr. Roger Finney of Conquest Boats. (*See* TR, at 126–129). Further, the lease Nescher presumably refers to (Exhibit 12) is one concerning certain tangible assets to Conquest by SBBN *or* Nescher *or* Ben Enterprises, depending upon which of Nescher's answers is believed. And, as indicated earlier, Nescher has very little credibility with this Court. In any event, whatever else may be said about the lease (Exhibit 12), it does not contain any agreement concerning the use of any trade names. In short, the court finds that Conquest has not used the trade names in ignorant good faith. Therefore, Conquest can claim no right to the trade names other than such rights as it may have acquired through Nescher, and American may prevent Conquest from using the names.

### CONCLUSION

In summary, the court finds as follows: Nescher is not a credible witness. Under the circumstances of this case, the law presumes that SBBN acquired the trade names when it acquired the business which

Nescher had been conducting as an individual. No evidence of any contrary arrangement was presented. SBBN therefore acquired the trade names.

American acquired SBBN's interest in the trade names and, as such, it acquired the right to keep Nescher from using those names in competition. Conquest has no right to the trade names other than such rights as it may have acquired through Nescher. Therefore, American may also prevent Conquest from using the names.

Nescher and Conquest have and are engaging in unfair competition with American by "passing off [their] goods or services as those of plaintiff by virtue of a substantial similarity between the two, resulting in confusion on the part of potential customers." *Reddy Communications,* 477 F.Supp. at 948. The use of the trade names by Nescher and Conquest can be enjoined pursuant to 15 U.S.C. § 1125(a). *See Eastman Kodak Co. v. Royal–Pioneer Paper Box Manufacturing Company,* 197 F.Supp. 132, 133 (E.D.Pa.1961); *see National Lampoon, Inc.,* 376 F.Supp. at 750.

Alternatively, the court finds that Nescher should have objected and failed to object to the sale of the trade names when he was identifying his objections to the proposed sale of SBBN. American relied to its detriment upon Nescher's failure to object. Nescher is therefore estopped from now claiming individual ownership of the trade names in question.

Based on the foregoing, IT IS ORDERED THAT:

(1) Defendants are hereby permanently enjoined from using the names purchased by American: "Sleek Craft Boats by Nescher," or any similar name, such as "Sleekcraft of Arizona," used by the bankrupt corporation, Sleek Craft Boats by Nescher, Inc., including the name "Sleek Craft."

(2) The parties shall bear their own costs and fees, and the Clerk of the Court shall enter judgment accordingly.