**In re IMPACT DISTRIBUTORS, INC., Debtor.**

**Alan L. Goldberg, as Chapter 7 Trustee for the Bankruptcy Estate of Impact Distributors, Inc., Plaintiff,**

v.

**Cuzcatlan Beverages, Inc., Impact Food and Beverages, LLC., and Neil Pryor and George Contos as Assignees of Hamilton Bank, N.A., Defendants.**

**Bankruptcy No. 99–15998–BKC–AJC. Adversary No. 00–1057–BKC–AJCA.**

United States Bankruptcy Court, S.D. Florida.

Feb. 26, 2001.

Jesus Sanchelima, Miami, FL, for Cuzcatlan Beverages, Inc.

David Kleinberg, Coral Gables, FL, for Impact Food & Beverages, LLC.

Brian G. Rich, Miami, FL, for Alan Goldberg, Trustee.

James B. Miller, Miami, FL, for George Contos and Neil Pryor.

## MEMORANDUM OPINION

LARRY L. LESSEN, Bankruptcy Judge.

This matter came before the Court on an adversary proceeding brought by the Chapter 7 trustee, Alan Goldberg (the "Trustee", "Plaintiff", or "Goldberg"), pursuant to Fed. R. Bankr.Pro. 7001(1) and (9), seeking to avoid as a fraudulent transfer the Debtor's interest in a trademark, and to determine whether the interest in and to that trademark is property of the estate pursuant to 11 U.S.C. § 541(a).

The Court conducted a trial on September 20 and 21, 2000. Upon review of the court file, documents submitted into evidence and upon consideration of the arguments presented by counsel and the evidence presented at trial, the Court concludes, for the reasons that follow, that the Trademark remains property of the estate since the Debtor's attempted assignment of the Trademark was invalid as it was merely an assignment in gross.

### *Procedural and Factual Background*

On June 17, 1999, Impact Distributors, Inc. (the "Debtor"), filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Code"). Plaintiff Goldberg is the Chapter 7 Trustee for the bankruptcy estate of the Debtor. By Order dated June 30, 1999, the Trustee abandoned all other physical assets of the Debtor. Specifically excepted from this abandonment was the Debtor's rights in and to the Cuzcatlan Trademark (the "Trademark").

On January 14, 2000, the Trustee filed his Motion For Order Authorizing Sale of Trademark Free and Clear of Liens and Encumbrances Pursuant to 11 U.S.C. § 363. The Trustee proposed to sell the estate's right, title and interest, if any, in and to the name and Trademark "Cuzcatlan," and all colorable imitations thereof including all goodwill associated therewith, including, without limitation, the estate's right, title and interest in United States Trademark Registration Number 1,699,-307.

The Court scheduled a hearing on the Sale Motion for February 15, 2000. Defendant Cuzcatlan Beverage, Inc. ("CBI") filed a Motion to Intervene, claiming that it had an interest in the Trademark superior to the estate's interest. At the hearing on the Sale Motion, the parties agreed that the Trustee would file an adversary complaint to determine the ownership of the Trademark. On February 25, 2000, the Trustee filed this proceeding against CBI

and Impact Food & Beverage, LLC. On March 3, 2000, the Defendant CBI filed its Answer, Affirmative Defenses and Counterclaim to the Complaint. In response to Defendant CBI's Motion to Dismiss for Failure to Join an Indispensable Party, on April 28, 2000, the Trustee filed an Amended Complaint adding Defendants George Contos and Neil Pryor (hereinafter "Contos" and "Pryor") to this action, as assignees of Hamilton Bank, N.A. On August 9, 2000, CBI filed its Amended Answer to Plaintiff's Amended Complaint. The Clerk entered a Default Order against Impact Food & Beverage, LLC on June 5, 2000, for failure to file an answer. Thereafter, on July 5, 2000, Impact Food & Beverage, LLC filed a Proposed Answer and Affirmative Defenses to Plaintiff's Amended Complaint. On July 20, 2000, this Court entered an Order vacating the Clerk's Default Order, thereby accepting Impact Food & Beverage, LLC's July 5, 2000, Proposed Answer and Affirmative Defenses. Defendants Contos and Pryor, as assignees of Hamilton Bank, N.A., submit that they have a lien in and upon the Trademark by virtue of their purchase of the Hamilton Bank Loan and that the Trustee has the right to sell the Trademark subject to their lien interest.

The Debtor is a Florida Corporation formed in 1986. The Officers of the Debtor were all members of the Giammattei family: President, German Giammattei, Vice President, German Giammattei, Jr. and Treasurer, Jaime Giammattei. The Debtor was primarily involved in the import, export, distribution and sale of soft drinks, sodas and beverages within the United States, various Caribbean nations and elsewhere. The Debtor produced and sold the soft-drink Cuzcatlan and registered the name with the U.S. Patent and Trademark Office (the "PTO") on April 14, 1992. On July 7, 1992, the PTO issued a certificate of registration to the Debtor, registration number 1,699,307, evidencing Debtor's use of the Trademark.

In early 1994, Contos and Pryor commenced a business relationship with the Debtor through an entity known as NatureFresh. In early 1995, the parties agreed that a corporate restructuring should be pursued whereby the Debtor would be the main operating company and NatureFresh's and the Debtor's trademarks, including the Trademark at issue in the instant proceeding, would be owned and held by separate holding companies and not by the Debtor. The primary reason for the proposed restructuring was to attract additional working capital.

Thereafter, in October 1995, in an effort to implement this proposed restructuring, the parties formed Impact Food & Beverage, LLC and yet another new company, Impact Distributors, LLC and registered these entities with the Secretary of State of Delaware. Both entities were to maintain their office addresses at 4600 S.W. 74th Avenue, Miami, Florida 33155, the same address as the Debtor. The members of the Giammattei family owned and controlled Impact Food & Beverage, LLC and Impact Distributors, LLC.

On October 30, 1995, the Debtor executed a document entitled "Assignment of Trademark from Impact Distributors, Inc. to Impact Food & Beverage, LLC." The assignment was recorded with the PTO on April 4, 1996. It is this assignment which is at issue in the instant adversary proceeding.

Two months later, on January 1, 1996, the Debtor executed a document entitled "Transfer of Assets from Impact Distributors, Inc. to Impact Distributors, LLC." This document appears to be nothing more than an attempted assignment of all assets of the Debtor to Impact Distributors, LLC. There is no evidence that this as-

signment ever occurred. Although the assignment was a part of the planned restructuring, the evidence shows that this "transfer" never took place.

Under the proposed restructuring, in early 1996, Pryor and Contos contributed approximately $90,000 worth of assets to the Debtor and were issued shares of the Debtor. In 1996, the Debtor had its strongest year ever with sales exceeding $2,000,000.

In March 1997, the Debtor executed a Promissory Note and Security Agreement evidencing a loan in the amount of $500,000 from Hamilton Bank, N.A. (the "Hamilton Loan"). The Hamilton Loan was secured by all of the Debtor's assets, including trademarks, although there is no specific reference to the Cuzcatlan Trademark. In connection with the Hamilton Loan application process, Hamilton Bank reviewed the Debtor's financial and business plan which indicated that the Debtor owned certain patents and trademarks. The Hamilton Loan was guaranteed by Contos, Pryor, German Giammattei, German Giammattei, Jr. and Jaime Giammattei. Pryor testified that he personally guaranteed the Hamilton Bank loan with the understanding that the restructuring had never been effectuated and that the Mark remained property of the Debtor.

On May 8, 1997, Certificates of Cancellation were filed on behalf of Impact Food & Beverage, LLC and Impact Distributors, LLC with the Delaware Secretary of State. The reasons for cancellation as stated in the Certificates of Cancellation were that the companies never began operations.

On July 7, 1997, Attorney Robert Haines of the firm of Sherman and Shalloway sent a letter to Jaime Giammattei regarding the need for the filing of Affidavits of continued use for the Trademark. On September 7, 1997, German Giammattei, in his capacity as President of the Debtor, filed Section 8 and 15 Affidavits naming the Debtor as the owner of the Trademark (the "8 & 15 Declaration") and the Registration. German Giammattei, in his capacity as President of the Debtor, signed the 8 & 15 Declaration under the penalty of perjury and attached a specimen showing that the Debtor, Impact Distributors, Inc., continued to use the Trademark. In October 1997, the PTO accepted the 8 & 15 Declaration. The Debtor was the only entity of the parties involved in this case to have ever filed a Registration of Section 8 & 15 Declaration regarding the Cuzcatlan Trademark with the PTO. The Debtor acknowledges the filing of the 8 & 15 Declaration, but asserts that identifying the Debtor as the registrant was an error.

The Debtor filed its Petition for Chapter 7 relief on June 17, 1999.

On July 27, 1999, Jaime Giammattei filed a document entitled "Certificate of Correction of Impact Food & Beverage, LLC" with the Delaware Secretary of State. Therein, Jaime Giammattei represented that the aforementioned Certificate of Cancellation of Impact Food & Beverage, LLC was improperly filed. Post-petition, the Delaware Secretary of State certified that Impact Food & Beverage, LLC was in good standing as of September 14, 1999.

On September 9, 1999, subsequent to the filing of the petition in this matter, but prior to reinstatement by the Delaware Secretary of State, Impact Food & Beverage, LLC assigned its rights in the Trademark to Defendant CBI. As previously stated, Defendant CBI is also owned and controlled by the Giammattei family. After purported transfer of the Trademark from Impact Food & Beverage, LLC to CBI, and after the filing of the petition in the instant matter, Defendants filed a pre-

viously executed assignment form in the name of Impact Food & Beverage, LLC with the PTO. Thereafter, Defendant CBI also filed documents with the PTO showing that it had received an assignment of the Registration from Impact Food & Beverage, LLC to itself.

The Debtor further acknowledges that the records of the PTO fail to show any assignments of the Trademark in question, but states that the public records of the PTO have remained outdated as the PTO only adopted an update policy in October 1999. While this may be true, the Court notes that the finding that the Debtor retained ownership of the Trademark does not rest on the representation of the 8 & 15 Declaration alone. For the reasons that follow, the Court holds that registration alone is not indicative of ownership of a Trademark, but the Debtor's constant use of the Trademark, in conjunction with the Debtor's prior registration of the Trademark supports the finding that the Trademark at issue remains property of the Debtor's estate.

### Discussion

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, in that it arises in the administration of the bankruptcy case of Impact Distributors, Inc. and relates to property of the bankruptcy estate. This Complaint raises matters as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (M). Venue is proper in the Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. § 1409.

■ It is undisputed that in 1995, the Debtor attempted to assign the Trademark to Defendant Impact Food & Beverage, LLC. The question before this Court is whether the 1995 assignment was valid. For the reasons that follow, the Court finds that the 1995 assignment was not valid, but rather was merely an assignment in gross.

■ United States trademark laws are based on the concept of *use,* rather than registration. As a result, the party that first uses a mark, develops common law trademark rights that are, or may be, superior to the rights acquired by a later registrant of the mark. Moreover, a party that registers or owns the mark, without use, develops no trademark rights under the U.S. trademark laws. Ownership of a trademark depends upon usage, not creation. "Mere conception of the term gives no trademark rights and it is the actual use in connection with a particular business which is required." *American Sleek Craft, Inc., v. Nescher,* 131 B.R. 991 (D.Ariz.1991) (quoting *Montgomery v. Kalak Water Co. of New York, Inc.,* 196 F.Supp. 173, 177 (S.D.N.Y.1961)). United States trademark law requires that trademarks be used in commerce in order to preserve an owner's rights therein. The term "used in commerce" means the bona fide use of a mark in the ordinary course of business and not made merely to reserve a right in a mark. Under the Lanham Act, a mark shall be deemed "used in commerce" when it is placed on goods and those goods are sold or transported in commerce. 15 U.S.C. § 1127 (1999).

■ Trademarks cannot be sold or assigned apart from their business as they do not have discrete value as property. The assignment of a trademark may be declared invalid if the trademark is assigned or sold without the associated business. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* (4th Edition 1997). "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the

marks they employ." *TMT North America, Inc. v. Magic Touch*, 124 F.3d 876 (7th Cir.1997); McCarthy, supra, § 18:4.

 A trademark is merely a symbol of goodwill. Thus, goodwill and its trademark symbol are inseparable and cannot be separated without invalidating both. McCarthy, *supra*, § 18:2, p. 18–5 (1999); 15 U.S.C. § 1060. A trademark has no significance apart from the goodwill it symbolizes. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). A sale (assignment) of a trademark apart from its goodwill is characterized as an "assignment in gross" and passes no rights to the assignee. *See, Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 956 (7th Cir.1992).

In the case of a bare assignment of a trademark, apart from genuine goodwill, assets, trade secrets or management, courts will generally invalidate such a transfer as an assignment in gross. McCarthy, supra; *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir.1969) (stating that the assignment was in gross because there had been no transfer of "customer lists, merchandise, equipment, recipes, decals or other goods"); *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 290 (8th Cir.1969) (holding the transfer invalid when the assignee did not acquire any of the assignor's assets, such as the formula or process by which the soft drink was manufactured); and *Hough Mfg. Corp. v. Virginia Metal Indus., Inc.*, 453 F.Supp. 496, 501–02 (E.D.Va.1978) (holding that the separate, earlier sale of the defunct business' tangible assets rendered the later sale of the trademark invalid).

Section 1060 of the Lanham Act provides the statutory basis for the invalidation of an assignment in gross. In interpreting this Statute, courts have

consistently held that the policy for invalidating such transfers is to protect the public from being misled or confused about the source and nature of the goods. *Sugar Busters LLC v. Brennan*, 177 F.3d 258 (5th Cir.1999). The most telling sign of an assignment in gross is the transfer of the trademark separate and apart from any tangible assets. *Pepsico, Inc., supra*; *Haymaker Sports v. Turian*, 581 F.2d 257, 261 (C.C.P.A.1978) (holding the assignment invalid because the assignee never used the mark and never acquired any of the assignor's tangible assets or goodwill); *Greenlon, Inc. v. Greenlawn, Inc.*, 542 F.Supp. 890, 895 (S.D.Ohio 1982) (stating that while "no tangible assets must be transferred to the assignee to validate the assignment of a mark," the assignment was invalid because the assignor did not transfer any part of his business when he effected the assignment and received a license back).

 "A trademark license is a grant of permission to use the grantor's trademark." *Bunn–O–Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F.Supp.2d 914, 921 (C.D.Ill.2000), citing McCarthy, §§ 18:42–18:43. An assignment and license back to the assignor is valid commercial practice which enables the assignor-licensee to continue the same business. McCarthy, supra, § 18:9; *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371 (Fed.Cir.1982), cert. denied, 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983).

 In the instant case, the Debtor began using the Trademark as early as May 3, 1988. The Debtor continued to use the Trademark continuously and uninterruptedly until immediately prior to the filing of the instant bankruptcy petition. For the Debtor to continue using the

Trademark after a purported assignment to a new "owner", there needed to be a valid license back agreement. "A license back is valid if it satisfies the conditions of validity for trademark licenses generally." *Visa, U.S.A.,* 696 F.2d at 1376. A valid licensing agreement "provides for adequate control by the licensor over the quality of the goods or services produced under the mark by a licensee." *Haymaker,* 581 F.2d at 261.

Although there was testimony that there was an "oral license-back" agreement which permitted the Debtor to continue using the Trademark, there is no credible evidence that shows that any such agreement actually existed.[1] Members of the Giammattei family testified both in deposition and at trial that after the alleged assignment, the Debtor never paid any money, commissions or royalties to Impact Food & Beverage, LLC for the Debtor's continued use of the Trademark.

There is no doubt that the idea of a license back agreement was considered when the Giammattei family formed Impact Food & Beverage, LLC, as is evidenced by the draft "Trademark License and Bottling Agreement Between Impact Food & Beverage, LLC and Impact Distributors, LLC" which the Debtor introduced as evidence. However, the Court finds that the unsigned draft between Impact Food & Beverage, LLC and an entity other than the Debtor[2] is not sufficient to show an actual license back agreement between the Debtor and the purported owner of the Trademark. Moreover, the evidence clearly shows that when the Debtor received proceeds resulting from the sale of Cuzcatlan beverages which should have been paid as royalties to Impact Food & Beverage, LLC, the Debtor made the deliberate decision not to pay any monies to Impact Food & Beverage, LLC because the Debtor needed the money for "internal growth". (See, Deposition Testimony of Jaime Giammattei, p. 46, 1.21). It is also important to note that Impact Food & Beverage, LLC ceased operations, or possibly never even began operations, on May 8, 1997. Impact Food & Beverage, LLC was not reinstated until post-petition. Therefore, it is unlikely that a non-existent entity was able to maintain the requisite "adequate control" required for a valid license back agreement. *See, Haymaker, supra.*

It is clear that at all times, from when the Trademark was first developed to when the Debtor attempted an assignment of the Trademark to Impact Food & Beverage, LLC and in the years that followed, the individual members of the Giammattei family have overseen the quality control of the Cuzcatlan soft-drink beverages. It is also clear that the individual members of the Giammattei family intended to be and believe that they personally are the true owners of the Trademark. Unfortunately for the members of the Giammattei family, the intricacies of trademark law are unique and different from regular laws governing ownership of other types of property. *See, TMT North America,* 124 F.3d at 882. ("Strictly speaking ... trademarks are not ordinary property interests.") As such, although the members of the Giammattei family may have intended to separate the

---

**1.** The Court notes that the evidence supports a contrary position as there was a written "Exclusive Marketing & Distribution Agreement" between NatureFresh and the Debtor.

**2.** The Draft Agreement is between Impact Food & Beverage, LLC and Impact Distributors, *LLC*—not the Debtor, Impact Distributors, *Inc.* (emphasis added). In addition, the Court can conclude that since the parties to the unsigned draft agreement also involved individuals controlling the Debtor, the Debtor clearly knew how to create a license back agreement, had it intended to do so.

Trademark from the Debtor, their actions failed to effectively effectuate any such transfer.

Although it has been established that the Debtor attempted a corporate restructure in 1995, the evidence shows that the planned changes were never fully effectuated. The Court acknowledges several attempted assignments of assets to various entities. However, throughout all the attempted changes, one thing has remained the same: regardless of purported assignments of the Trademark, the Debtor has at all times continued to use the Trademark under the supervision of the individual members of the Giammattei family. There is no evidence that anything other than a bare assignment of the Trademark occurred in 1995. Nor is there any evidence which supports the Debtor's assertion that the Debtor merely continued to use the Trademark pursuant to a licence back agreement. At all material times, the Debtor retained use of the Trademark, the assets of the business and the goodwill associated therewith. Moreover, even if this Court were to find that the Debtor succeeded in validly transferring the Trademark to Impact Food & Beverage, LLC in 1995, the Debtor subsequently regained common law rights to the Trademark, following the dissolution of Impact Food & Beverage, LLC in 1997, as the Debtor continued to maintain the operations of the business and use the Trademark.

The Debtor suggests that this Court should disregard the Certificate of Cancellation filed with the Delaware Secretary of State, which clearly states that Impact Food & Beverage, LLC never began operations, and should disregard the 8 & 15 Declaration filed by the Debtor's President in 1997, which affirmatively represented to the PTO that the Debtor owned the Trademark. It is hard to justify ignoring actual signed documentary evidence which clearly shows that the Debtor continued to use and own the Trademark where there is no signed documentary evidence to show the contrary. There is, however, no question that the Debtor continuously used the Trademark since its inception, and at no time relinquished control of the Trademark.

## CONCLUSION

Because this Court finds that the Debtor's attempted assignment of the Trademark to Defendant was invalid, this Court need not examine whether or not any such attempted transfer was a fraudulent transfer. However, the Court notes that if the Trustee were to proceed solely on a fraudulent transfer theory, the argument would probably fail. Had the Debtor attempted to assign most any other type of property other than a trademark, the Court may have reached a different conclusion. The unique requirements of trademark law mandate that the Court reach the conclusion that the Debtor's attempted assignment of the Cuzcatlan trademark is invalid. Therefore, the Court finds that the Trademark has remained property of the Debtor at all times and the Trademark is property of the estate. The Court will enter a separate final judgment consistent with the findings and conclusions stated herein.

### FINAL JUDGMENT IN FAVOR OF TRUSTEE, ALAN GOLDBERG

THIS CAUSE having come before the Court for trial on an adversary proceeding brought by the Chapter 7 trustee, Alan Goldberg (the "Trustee", "Plaintiff", or "Goldberg"), pursuant to Fed. R. Bankr. Pro. 7001(1) and (9), seeking to avoid as a fraudulent transfer the Debtor's interest in a trademark, and to determine whether the interest in and to that trademark is

property of the estate pursuant to 11 U.S.C. § 541(a), and the Court, having entered a separate Memorandum Opinion finding that the trademark remains property of the estate, hereby ORDERS:

1. Judgment is entered in favor of the Trustee as to Count IV of the Amended Complaint seeking Declaratory Judgment. The Trademark is property of the estate and the Trustee is directed to notice the sale of the Trademark to Contos and Pryor, subject to higher and better offers. Contos and Pryor as assignees of Hamilton Bank, N.A. have a lien interest in the Trademark.

2. As the Court finds that the estate is the owner of the Trademark, Judgment is entered in favor of the Trustee as to Count V of the amended Complaint, and an injunction is hereby issued precluding the Defendants and all parties in active concert with them who receive actual notice of this injunction from utilizing the Trademark.